MONROE ANDERSON ET AL. v. STATE OF MISSISSIPPI.

[46 South., 65.]

CRIMINAL LAW AND PROCEDURE. *Change of venue. Evidence.*

Testimony warranting a change of venue in a criminal case is not overcome by a showing that twelve impartial jurors could be found in the county by picking them, or by testimony predicated wholly of the general good character of the people of the county.

FROM the circuit court of Amite county.

HON. MOYSE H. WILKINSON, Judge.

Anderson and others, appellants, negroes, were indicted for an assault and battery with intent to kill and murder one Bates, a white man. They moved for a change of venue, their motion was denied; they were tried and convicted and appealed to the supreme court. The facts developed on the hearing of the motion for a change of venue, the only point decided by the supreme court, are fully stated in the opinion of the court.

*R. N. & H. B. Miller,* for appellants.

The evidence taken on the motion for change of venue overwhelmingly shows and practically without dispute that when young Bates got shot in that difficulty he was very badly hurt, his lower jaw being shot away, and he was utterly disfigured and ruined for life. There was much feeling on the subject in the community and there was a meeting largely attended held at the court house, and these defendants were arrested and put in jail. This meeting resolved to lynch these negroes and were only prevailed upon by the kindly hearted, justice-loving sheriff by hard work to desist. There were numbers of meetings or gatherings of the people in all parts of the county and nearly every man in that county had prejudged this case.

When the motion was being tried there was a vast throng of people in truth and in fact, it is believed, ready to lynch defend-

ants, that is many people willing to lynch them if they should be granted a change of venue, and we confidently believe after reading this record that the judge overruled it believing that course was necessary to save the defendants' lives. Under this condition of things to sustain the finding of the court in forcing these poor creatures to a trial under these awful conditions in Amite county, would be, to quote the language of Justice WHITFIELD in a celebrated case in our own reports, to establish: "Too dangerous a doctrine, surely, to find any place in jurisprudence framed under bills of rights in which, in the land of their origin, the right to maintain inviolate the jury trial, has been written in blood with the point of the sword, as the final declaration of freemen on the subject."

*R. V. Fletcher,* attorney general, for appellee.

A review of the testimony shows that the talk about lynching is the result of vain imaginings, that the community at Liberty was somewhat excited at the time of the shooting, and some meetings were held for the purpose of aiding in the capture of the criminals. At one of these meetings some irresponsible individual suggested lynching but the suggestion was promptly vetoed by the sober and conservative element in charge of affairs. The case is one where the following language used by this court is strikingly applicable:

"The record is barren of any proof showing any prejudice or ill will towards the appellant or any prejudgment of this case in the public mind. The excitement in the village where the offense was committed was only the indignation naturally aroused in any community by the commission of an atrocious crime; but this excitement was neither widespread nor of long duration, and after it subsided the public awaited calmly the decision of the courts." *Butler* v. *State,* 39 South., 1005.

WHITFIELD, C. J., delivered the opinion of the court.

The appellant, Anderson, in conjunction with eight other negroes was indicted for committing assault and battery upon W.

H. Bates unlawfully, willfully, and feloniously with a rifle and pistols, with intent to kill and murder the said Bates. Anderson, appellant, and Mack Taplin and Charley Gayden, were jointly tried, and all convicted and sentenced to ten years in the penitentiary, and have all prosecuted this appeal to this court.

In the progress of the trial, a motion for change of venue was made by the appellants, in conformity with provisions of the statute on that subject, and on the hearing of that motion much testimony was taken.    Each of the three judges of this court has severally read all of the testimony taken on the motion for change of venue.  We might briefly summarize this testimony, in order to show that it is overwhelmingly demonstrated that the motion for change of venue should have been sustained. The testimony of Ive Morgan was to the effect that, if the right men should be got on the jury, there might be a fair and impartial trial; that he based this opinion on the good citizenship of the county, and what he meant by a fair and impartial trial was a trial in which a man should prove that he was innocent.   G. H. Barney testified that a fair and impartial trial could not be had in the county, and that was his idea after going around over the county generally.  Hollis Jones testified that defendants could not get a fair and impartial trial, and that pretty nearly every one he had heard express himself said that they were guilty, and, further, that he believed everybody in the county had heard something about the case.   Ashley Reynolds testified that he had heard a heap of talk about the case, and that the only way to get a fair and impartial trial would be for some one who knew how to pick the jury.   Ben Griffith testified that nearly everybody in the county knew of the facts in the case, and that the people in general had prejudged the case and when pressed, on cross-examination, as to whether the crowd in which a motion was made to hang the negroes did not fight that motion down, he said: "They finally fought it down, but it was against the will of the people."  William Whittaker testified that he thought the

general public had prejudged the case, and a lot of ill will had been manifested against the defendants throughout the country, and that he did not believe a fair and impartial trial could be had. He used this significant language: "I do not believe they could. Of course, there could be men picked out in the county that would give them a fair and impartial trial; but I don't believe that a jury could be drawn which would give them a fair and impartial trial." Seab Reynolds testified that he had heard men say they were ready to hang defendants, and that on the day of the meeting there were a few men who wanted to lynch them, and would have done it if they had gotten a chance. W. H. Griffin testified that on the day of the meeting the sentiment was for lynching these negroes and was very strong against them; that he had not heard a man express a sentiment but what it was prejudged; that there was a great deal of ill will manifested against them; that the people were prejudiced against them; that he thought every man in Amite county had heard of the case, if he read any at all; that it was published in all the newspapers, went pretty well everywhere, and that the newspapers claimed it was a race riot; and, on cross-examination he repeated that he did not suppose a man could be found in the county who did not know all about it, and that these defendants would have to prove themselves innocent if they were tried. This is the substance of the testimony for the defendants.

The state's testimony, by a number of witnesses, is substantially that the witnesses believed a fair and impartial trial might be had in the county if the jurors were selected or picked; that there were as good men in Amite county as in any county—men who would do right, etc. One witness, Sam Robinson, in testifying this way, finally admits that there was ill will against these defendants, and, finally, he admitted that he had heard a number of people say that these defendants should be punished; "that they should get them out of there and break their necks." And he further said, most significantly, on cross-examination, that there was a crowd right there, at the time of the trial, who

would be willing to lynch these defendants, and that some of them were in the court room. R. M. Cox, for the state, testified that he did not think there was any more prejudice in the county against these negroes than there would be against any other negroes for shooting a white man; that he did not think there was any prejudgment generally in the county, and that a fair and impartial trial could be had; and that he did not think there were many men in Amite county who would disregard their oaths. T. J. Reynolds, for the state, testified that the defendants could get a fair trial in the county; that as good men lived in Amite county, as in any other county. On cross-examination he said, if the defendants proved themselves innocent, the jury would turn them loose. Eph Nunnery stated that he thought defendants could get a fair and impartial trial. Sam Marsalis, for the state, testified that he thought defendants could get a fair trial, and that he thought there were men in Amite county who would give any man a fair and impartial trial. R. D. Moore, for the state, testified that he thought defendants could get a fair trial; that there was some prejudice in Amite county, but that you would find that in any kind of case. He admitted, on cross-examination, "that there were some fellows up there [that is, in the meeting] who wanted to hang them," and when asked whether the public in general were not prejudiced in the case against the defendants, replied, "I can't say," and that he judged there were some people that had ill will against them, other than in Liberty, and finally, when pressed, and asked "Wouldn't there have to be a venire drawn in order to select twelve men who were unbiased?" he said, "I can select twelve who are unbiased," and at last admitted that there was a good deal of prejudgment or ill will against the defendants in the county, but not enough, he thought, for a man to say that defendants could not get a fair and impartial trial. W. H. Causey, for the state, testified that he thought defendants could get as fair a trial as anybody else "under the circumstances." "Under the circumstances" is a very significant phrase in this connection. S. R. Jones, for the state,

testified that he thought defendants could get a fair trial; that this was the opinion he had of the people of Amite county. He finally admitted that there might be some prejudgment against defendants however. H. M. Bates, the father of W. H. Bates, Jr., who was shot, said he was sheriff of the county at the time that he did not know of any violence that was offered to the defendants before they reached him, but that there was some talk of violence among a few at the meeting in the courthouse; and that he (greatly to his credit) was opposed to violence, and so stated in the courtroom that day. He further says that there was some talk of violence up in the courtroom that day.

This was all the testimony on the part of the state. It will thus be seen that the substance of the testimony of the witnesses for the state, who said that they thought a fair trial could be had, was that this was based upon their opinion of the people of Amite county, upon their faith in the good citizenship of the county, and upon their belief that sworn men would give the defendants a fair and impartial trial, if they took the oath; while some even of the state's witnesses admitted frankly that what they meant was that the defendants would have to prove themselves innocent, and that a fair and impartial jury could only be had by selecting or picking them. It is idle to talk about a fair and impartial trial to be had, on testimony such as is here set out, in the county at the time. The right to a fair and impartial trial is a sacred, constitutional right. To hold, on the testimony on a motion for a change of venue in this case, that these defendants were not entitled to a change of venue, would be to establish, as we have once before said, and now repeat, "too dangerous a doctrine surely to find any place in a jurisprudence framed under Bills of Rights in which, in the land of their origin, the right to maintain inviolate the jury trial has been written in blood with the point of the sword as the final declaration of freemen on the subject."

In accordance with the principles announced in the case just quoted from, and especially in the case of *Tennison* v. *State,* 79

Miss., 708; 31 South., 421, and also *Brown* v. *State,* 83 Miss., 646, 36 South., 73, particularly the *Tennison case,* the court should promptly have granted a change of venue; and for the error in refusing to grant the change of venue the judgment is reversed, and the case remanded.

*Reversed.*

