## A. P. MAGNESS V. STATE.

### [60 South. 8.]

1. CRIMINAL LAW. *Change of venue. Prima facie showing. Jury. Code 1906, section 1009.*

   An application for a change of venue in the form and to the effect prescribed by the statute presents a *prima facie* showing for a change of venue, which could be contested by the state or the court could *sua sponte* examine witnesses on the matter.

2. CRIMINAL LAW. *Change of venue. Prejudice.*

   Where a defendant was tried for murder in a county where the people were hostile to him and where public sentiment had crystalized into a fixed belief of his guilt, where the evidence in favor of self-defense was explicit and where, if the jury had entertained a reasonable doubt of its truthfulness, they might have returned a verdict of not guilty—in such case the failure to grant the defendant a change of venue was reversible error.

3. SAME.

   The requirement of the law is not satisfied by the mere impaneling, of twelve men against whom no legal complaint can be made. The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case fairly and impartially.

4. CRIMINAL LAW. *Improper remarks by district attorney.*

   Where the district attorney on the trial of a defendant for murder said, "This is no ordinary defendant; this is no ordinary case, for from the defendant's own lips on yesterday you were informed that this is not the first time the defendant has stood before a jury in Grenada county charged with dyeing his hands in human blood." Such remarks were highly prejudicial to defendant as suggesting to the jury that defendant had been acquitted by one jury, that he then escaped just punishment and this jury should see to it that he does not escape a second time.

5. CRIMINAL LAW. *Jurisdiction. Carrying case over term. Code 1906, Section 1009.*

   Section 1009, Code 1906, authorizing the completion of a trial after the expiration of a term of court, where the same was begun be-

fore the term of the court expired, does not authorize the carrying over of more than one case, and where during the trial of a criminal .case another case was put on trial and neither case was finished until after the expiration of the term, a verdict of guilty in the last case placed on trial was a nullity.

APPEAL from the circuit court of Grenada county.
HON. G. A. McLEAN, Judge.
A. P. Magness was convicted of murder and appeals. The facts are fully stated in the opinion of the court.

*Hill & McBee*, for appellant.

We contend that it was error for the trial judge to extend the term of his court for the purpose of trying two cases. This is purely statutory and this exact question has never been decided so far as we can find, but it does. seem that a reasonable construction of section 1009, Code 1906, would justify anyone in concluding that the term of court could only be extended to try one case which was being tried in good faith and in regular order at the very time the term of the court expired; then under the statute it could be carried past the regular term of the court for completion, the court being powerless to consider any other case except the one carried over. The language of the statute clearly means one case for the singular number is used and the word "any case." Then further the statute says, "bring it to a conclusion." Now, these are words of limitations we submit and the statute was intended to meet the emergency that often arises when a case is begun in term time and is unexpectedly extended beyond the term time, but there is no authority at law or anywhere else for a trial judge to suspend a case, one of the highest known to law, for the purpose of beginning the trial of another case in order to carry that second case beyond the regular term of the court, especially so when it was evident and admitted that the case already on trial would have to be carried past the regular term of court for completion. We in-

sist that the suspension of one murder case in order to begin the trial of another in order to take both past the regular term of court is unheard of, improper and illegal, and this one act alone convinces this court, no doubt, that Magness could not have had a fair and impartial trial at the January term of the court in Grenada county.

We come now to the application for change of venue. Certainly this application should have been granted. There was no conflict in the evidence. There was no dispute about the matter at all and on the evidence introduced to support the motion the change of venue should have been granted. But when this court looks to the entire record of the case, to the manner in which the case was tried, when it looks to the examination of the veniremen, there cannot be any possible doubt in the court's mind that it was little short of a crime to try Magness in Grenada county at the time he was tried. Everything points to a wild and fierce desire to convict this man of murder, regardless of law and regardless of justice. The application for a change of venue is a strong one. The testimony of the sheriff alone unsupported by the other witnesses entitled the defendant to a change. The sheriff of the county stated that he had to take the defendant to Hinds county jail in Jackson for safe-keeping; that he had to guard the jail at this term of the court; that he had heard of a mob being organized at that term of the court to lynch the prisoner. One witness testified that he had heard at least one hundred men at that term of the court express the opinion that Magness should be convicted and to the same effect some other witnesses testified. It is true that some of the witnesses for the defendant testified that Magness could have a fair and impartial trial in Grenada county, but this faith was based on their county pride. They believed that the men of Grenada county were as fair and impartial as of any other county. When the court remembers that this homicide occurred during a session of a circuit court of

Grenada county, that men from all parts of the county were assembled at the county seat, that the case was under discussion constantly during the entire term of the court, that the news spread that the defendant had been tried before for homicide in this county and acquitted, and that this case was discussed in connection with the present case, it seems to us that the motion for a change of venue should have been instantly sustainded.   We cite the familiar cases of *Saffold* v. *State*, 76 Miss. 258; *Tennison* v. *State*, 79 Miss. 708; *Brown* v. *State*, 83 Miss. 645; *Anderson* v. *State*, 92 Miss. 656.

*J. T. Dunn*, for appellant.

The first assignment of error is, did the court have the right to try this case at the time it did?   We submit that it did not.   Another murder case was sidetracked after it had begun and when the evidence was not quite concluded for no other reason than to start the Magness case, and then sidetracked this also in order to extend the term of the court and try two cases after the time fixed by law for the termination of that court.   If this could be done in this instance, then a term of court could be continued indefinitely simply by impaneling the juries in the different cases before the time fixed by law for the court to expire, and endless confusion would result therefrom, and the reason for the terms of court as fixed by law would be done away with.

Should the change of venue have been granted?   A strong case for the change was made by the witnesses, leaving out the sheriff, but with his testimony we submit that there could be no doubt.   This testimony taken in the motion for a change of venue was as conclusive of a prejudgment of this man's case in the public mind as it was possible to be.   Even this testimony demonstrated beyond peradventure that this man could not get that impartial trial guaranteed by the law to every citizen.   There were threats of mob violence; there was

the hurrying of the prisoner from Calhoun county to
Jackson, not daring to carry him through Grenada county.
The governor, as Magness passed back in custody of the
sheriff, notified other sheriffs along the line and these
other sheriffs, accompanied by other men of their coun-
ties, escorted the prisoner to Grenada. The whole county
seemed to be infuriated and this was shown by the ex-
amination of the veniremen on their *voir dire*. To talk
of an impartial trial, under such circumstances as this
is mockery. This man had just arrived in Grenada on
Tuesday evening of the second week of the court. He
was immediately arraigned, his case set for announce-
ment the next morning, before any announcement from
him and before any announcement was possible from
him, over the strenuous protest of his counsel, Mr. Hill,
as shown by this record, stating to the court at the time
that the man had just arrived, that the drawing of a
special venire at that time might jeopardize some of the
rights of the defendant, that the defendant could not be
advised of the status of affairs at that time is apparent,
yet in spite of these protests the venire was drawn on the
simple announcement of "ready" by the state, and
now the state, having forced this matter within less
than twenty-four hours after the defendant had arrived
in Grenada, after having been sped all over the state by
the sheriff to keep him from mob violence, solemnly ar-
gues that the defendant was estopped to ask a change of
venue after this. According to this view all that has to
be done to estop the defendant from asking a change of
venue is to "cut in" ahead of him before he announces
what he intends to do or before he could know and move
for a special venire. But in this case it was a denial of
a constitutional right to a fair and impartial trial, because
it was utterly impossible for that prejudgment, which was
shown so manifestly throughout the trial and especially
throughout the examination of the jurors who were to
try this case, not to invade the jury box. That being

true, that is that prejudgment was likely to invade the jury box, it was the duty of the court to grant the change of venue, because a fair and impartial trial under the circumstances was not likely.

*Creekmore & Stone*, for appellant.

The cases of *Saffold* v. S*tate*, 76 Miss. 258; *Tennison* v. *State*, 79 Miss. 708; *Brown* v. *State*, 83 Miss. 546 and *Anderson* v. *State*, 92, Miss. 656, are no stronger on their facts going to show prejudgment and ill will in the minds of the public than this case, and in truth this case is a much stronger one on its facts for a change of venue than either of those cases by reason of the remarkable showing of prejudgment of the case in the public mind as disclosed by examination of the jurors on their *voir dire*.

It was said by this court in *Cheatam's case*, 67 Miss. 355, that the question of error or no error as to a change of venue was not determinable alone from the standpoint occupied by the court in passing upon the question before the trial was commenced, but should be determined from the whole case including the examination of the jurors on their *voire dire*, etc. In that case a jury was selected from a venire of fifty men and the defendant did not exhaust his peremptory challenges. Look at this case according to the rule laid down in the Cheatham case and it will be apparent that a change of venue should have been granted.

In investigating the question of whether the court had the right to extend the term of court and try this case when he already had on trial the Caffey case, which could not be completed during the term as fixed by law, we have searched all the authorities at our command. We have been unable to find any case where a judge has undertaken to carry over more than one case. Indiana has a statute very much like ours on this subject, and in none of the cases construing this statute, and we found some eight or ten cases construing it, had the court under-

taken to carry over more than one case. Being unable
to find any authorities directly in point we go back to the
purpose for which the statute was passed and while it
is not on the exact point this question is very much illum-·
inated by the opinion in *Lipscomb* v. *State*, 76 Miss. 248.
In that case it is said that for the sure and true interpreta-
tion of statutes four things are to be considered; 1st, the
old law; 2nd, the mischief; 3rd, the remedy; 4th, the
reason of the remedy. The mischief to be remedied was
to prevent the cessation of a trial and the loss of what
had already been done simply because the court term
was not long enough to finish it. In other words it was
to enable the court to complete a case which in the ordi-
nary course had been taken up for trial and which on ac-
count of dilatory tactics, or on account of the length of
the case, could not be finished within term time. It was
not intended by the lawmakers to extend the term of the
court by this statute so that more than one case might
be taken up and finished after the expiration of the term,
for if this had been the intention they would simply have
lengthened the term of the court. The language of the
statute itself limits the right to try cases after the expira-
tion of the term to one case and we submit that a con-
struction of the statute that would permit the trial of
more than one case after the expiration of the term,
would do violence to the words of the statute and be en-
tirely at variance with the purpose and intention of the
lawmakers and have no connection whatever with the
evil which they sought to remedy by the statute. If the
judge can begin two cases for the purpose of carrying
both over beyond the term of the court then he may be-
gin three, four, five, or in fact as many as may be on the
docket and have the court terms thereby fixed not by
law but by the whim of the judge. This action of the court
in beginning the trial of this case when he did and when
he had another case on trial which could not be completed
during the term, was without warrant of law and the

court had no jurisdiction to try the case, receive the verdict of the jury and impose the sentence.

*Geo. T. Mitchell*, for appellee.

I shall consider the second, sixth, seventh and fifteenth assignments of error together. These assignments of error being based upon the fact that the court, after the trial of the case of the *State* v. *Sim Caffey* had commenced, had no right to suspend the trial of that case for the purpose of taking up the Magness case. I submit that a just construction of this record and a fair understanding of the same will show conclusively that the court did not exceed its authority in this matter, and that no injustice nor harm resulted to appellant by reason of the action of the court, but on the other hand that the action of the court in the matter was not only commendable but was within the strict line of his authority. I take it for granted that this court will agree with me when I say that the object and the purpose of the lawmakers in enacting statutes is not only to secure to a defendant all such rights as he may justly be entitled to, but also to secure to the state the right to a speedy trial when the laws of the country have been outraged.

Counsel for appellant rest their contention upon section 1009 of the Code of 1906, which is as follows:

"When the trial or hearing of any case, civil or criminal, has been commenced, and is in progress in any court, and the time for the expiration of the term as prescribed by law shall arrive, the court may proceed with said trial or hearing, and bring it to a conclusion in the same manner and with the like effect as if the stated term had not expired."

Now if I understand the contention of counsel it is that the court, having already proceeded with the trial of the Caffey case (although the Magness case was called two days before the trial of the Caffey case was commenced), thereafter had no right under any circumstances

to suspend the trial of the Caffey case, and call for an announcement in the Magness case, or draw a special venire in the Magness case, or impanel a jury in the Magness case, but that before any steps could be taken in the Magness case the Caffey case must have first been completed. I submit that such a contention is not consonant with reason, justice or a proper construction of the statute in question.

The Lipscomb case, 76 Miss. 223, determines that the trial of a criminal case has begun and is in progress when the court enters upon the impaneling of the jury for the trial of the matters of fact presented by the pleadings; therefore this case had been commenced and was in progress before the January term of the court expired, because at midnight on the last day of the term there were nine qualified men in the jury box.

There can be no question but the action of the court in suspending the Caffey case and calling the Magness case for announcement and also drawing the special venire in the Magness case was far from error, and it has been so decided by this court. See *Penn* v. *State*, 66 Miss. 450.

So the only question presented to the court is as to whether the action of the court in proceeding to impanel the jury in the Magness case during the suspension of the trial of the Caffey case constituted error. I submit that this court ought not to reverse upon this point unless it is shown that some harm resulted to the defendant thereby. The record shows that there was absolutely no interruption in the Magness case from the time of arraignment on Tuesday until the verdict was returned into court. He was arraigned on Tuesday, the case set for call on Wednesday, and on Wednesday when it was called and the defendant asked for further time in order that his process might be returned, same was passed until Thursday, when it was again called, and was then again passed until Friday, at which time it was again called,

and it appearing that some of the appellant's witnesses were still absent, the case was passed until Saturday, at which time the special venire was returnable. On that date appellant filed his motion for a change of venue, the hearing of which was promptly entered upon, and after this motion was overruled appellant immediately asked for an opportunity to prepare a written application for a continuance, which was granted by the court, and after said application was overruled the impaneling of the jury was then commenced. After the special venire had been exhausted, the court, as is customary in such cases, ordered the sheriff to summon an additional number of men from the body of the county, and the sheriff having stated to the court that he could not execute this order before a certain time, the court as is usual, passed the case until that time, and on that date the jury was completed and the hearing of the testimony commenced. There never was at any time the slightest interruption in the progress of this case, and I submit that it is impossible to conceive of a case that progressed so smoothly and so uninterruptedly as the case at bar. No harm could possibly have resulted to appellant by this course, and he cannot be heard to complain simply because he was given his constitutional right to a speedy trial.

Now it might be that if the suspension of the Caffey case and the interruption in the progress of that case had resulted in harm to him (Caffey) then Caffey, if he had been convicted, might have been in a position to have shown that some harm resulted to him and that his interests were prejudiced by such numerous interruptions of his trial, but Caffey was acquitted and therefore is urging no complaint.

Suppose Caffey had been on trial for misdemeanor and through some peculiar and unusual condition of affairs the case was prolonged, probably unnecessarily, would this court hold that the court below would have no authority or power to have suspended the trial of that case

and have taken up the trial of the Magness case, one of much greater importance? It might be that Caffey could have complained at the suspension of his trial if he could have shown that he was harmed thereby, but surely Magness could not complain. Or further, in order to show the absolute unreasonableness of the contention of counsel for appellant, suppose that the case on trial had been a civil case, would this court hold that the court below had no right to commence the trial of a capital case and suspend the trial of the civil case? Certainly not. It might be that if the losing party in the civil case could show that his case was prejudiced by such suspension, or interruption, that the court would grant him a new trial, but surely the defendant in the capital case would not be heard to complain where his case proceeded uninterruptedly, and there was no unusual delay in the proceedings.

In the case of *Ouidas* v. *State*, 78 Miss. 622, the point was there made by Ouidas, appellant, that it was error to suspend the trial of his case in order for the court to hear and determine a statutory reward matter but Judge Terrell, in delivering the opinion of the court, very properly held that as no harm could have been suffered by him by reason thereof that his contention was not well-founded, but on the other hand was purely technical. The determination of the whole matter rests upon the fact as to whether or not any harm results to a defendant by reason of the particular action. And since the court has held in the *Penn case, supra,* that it is not error to draw a special venire and set a case for trial pending the trial of another case, upon what theory of reasoning can it be held that the drawing of the special venire, setting the case for trial and partially impaneling a jury, would constitute reversible error? It strikes me that the main cause of complaint that appellant has in this case is that he was given a speedy trial at the first term of court, which was his constitutional right, although not asserted

by him. The language of Chief Justice CAMPBELL in the caes of *Jones* v. *State*, 60 Miss. 123, is indeed pertinent. He says:

"The case presents an instance of commendable determination by the officers of the law to insure to the accused a 'speedy' trial which was his constitutional right, if not asserted by him. The too common practice of permitting a term of the court after a homicide to pass before the trial of the slayer was justly departed from in this case, and the trial and conviction accurred in the same month in which the crime was committed. Such promptness may excite some surprise but it meets our hearty approval since a careful examination satisfies us that no wrong was done the prisoner."

To the same effect is the case of *Freeman* v. *State*, 29 So. 75.

Argued Orally by *W. S. Hill*, for appellant.

COOK, J., delivered the opinion of the court.

This is an appeal from the judgment of the circuit court of Grenada county sentencing appellant to be hanged for the murder of one Geo. W. Gillon. When the homicide was committed, the circuit court was in the first week of its term. Appellant was promptly indicted for murder and some days after his indictment he was arrested by the sheriff and taken to the capital, and there incarcerated in the jail of Hinds county. According to the evidence, this course was taken by him because of his apprehension of mob violence to appellant.

After the indictment, and when the sheriff, with appellant in custody, was en route from Jackson to Grenada, he received information that a mob was forming in Grenada county for the purpose of intercepting him and his prisoner, and for the purpose of saving the county from the unnecessay expenditure of time and money in the trial of appellant. With the advice of the governor, the

sheriff secured a corps of special deputies to assist in the protection of his charge. When the county was reached, the sheriff, out of an abundance of caution, superinduced by the omnious messages he had received, carried the prisoner by a circuitous and little used route to the county jail. From this time to the trial the sheriff deemed it prudent to employ a guard for the jail, and himself remained on guard, reinforced by others, after nightfall.

On Monday of the second and last week of the term appellant was arraigned, and pleaded not guilty. On the following day the state announced ready for trial, but the defendant, through his counsel, demurred to being required to announce, saying that they had not had time to secure the presence of their witnesses, and were not ready to make an announcement. Whereupon the district attorney requested the court to order the drawing of a special venire and to fix a day for the trial of the case, and this was done, the court fixing the following Saturday for the return of the venire. The defendant objected to this order of the court. On Thursday the court, having proceeded to the trial of another case, *State* v. *Caffey*, wherein a different person was charged with the crime of murder, his trial was temporarily suspended while appellant was again brought into court to announce his readiness or unreadiness for trial. Appellant announced that his witnesses had not appeared, and the court then passed the matter by, resuming the trial of the other case. On Saturday (the last day of the term) the day fixed for the return of the special venire the case of *State* v. *Caffey* was again temporarily set aside to take up this case. On the day before (Friday) appellant had asked that his case be passed because of the absence of two witnesses, but on Saturday these two witnesses were present. In the meantime, appellant had process issued for several other witnesses. All of the other witnesses first summoned for the defendant, except his wife, were present on Saturday. Defendant was required to state what he

expected to prove by the new witnesses, which he declined to do, and the court, at the request of the state, was proceeding to impanel the jury, when appellant interposed a motion to change the venue of the trial of his case. The court, over the objection of the state, decided to hear the witnesses in support of this motion. A number of witnesses were introduced by defendant in support of the motion. None were introduced by the state in rebuttal.

The application for a change of venue was in the form and to the effect prescribed by the statute, and thus presented a *prima facie* showing for a change of venue, which could be contested by the state, or the court could *sua sponte* have examined witnesses on the matter, but nothing of this sort transpired. After the hearing of the evidence, the court overruled the motion, and defendant asked for time to prepare a motion for a continuance. Time was granted, and it appeared to the court that unnecessary time was being consumed in the preparation of the motion. The defendant and his counsel were repeatedly warned, without avail, to present their motion. Finally, a peremptory order was made to bring defendant into court, which order was effectual, and defendant brought in his motion, which he claimed was incomplete for lack of time allowed by the court for its preparation. The motion as prepared was overruled. It was then about eleven o'clock in the evening of the last day of the term. The trial of the Caffey case was suspended, and the court ordered the impaneling of the jury for the trial of the present case, over the protest of defendant. The attempt was made to select a jury until twelve o'clock, at which time the term lapsed, and, the jury being incomplete, court was adjourned until Monday morning of the succeeding week.

It will be observed this case was taken up and the trial thereof begun by discontinuing, or temporarily suspending, the trial of another case, and both were carried over

and tried after the expiration of the term fixed by statute. On Monday further effort was made to impanel the jury from the special venire, without success, so the court ordered an additional venire summoned, and, while waiting, it returned to the trial of the Caffey case. So it was the unusual spectacle of the court trying two capital felonies at the same time was witnessed perhaps for the first time in this state, and that, too, after the expiration of the regular term of court. It is stated (which statement we have not verified), and not contradicted, that over one hundred of the special jurors were disqualified because of their prejudgment of the case. It is certain that a large number were so disqualified. We have endeavored to make a succinct statement of the procedure adopted by the court in the trial of this case, for the reason, it is believed that it is unique in the history of trials in this state.

The main reliance for a reversal rests upon the theory that appellant was denied a fair and impartial jury. The right of trial by an impartial jury is the dearest bought right of all peoples whose system of laws is based upon the common law of England, and this right is reserved as a part of our inheritance by the bill of rights of our Constitution. It is manifested by this record that appellant was tried in a county where the people were hostile to him, and where public sentiment had crystallized into a fixed belief of his guilt, and that, too, under circumstances which must have impressed all witnesses with the visible purpose of the trial court to try him then and there, whatever might be the consequences to another case, duly and regularly on trial, and of the same dignity and character under the law. Under our statute, the trial of one or the other of those cases was discontinued when the regular term expired. Was it this case, or was it the Caffey case? If this case was within the statute, what about the Caffey case? Caffey was acquitted by a jury, it is said; but is this true? He was acquitted by twelve men who

certainly composed a jury of the legal term, but was it a jury at all when the verdict was rendered?   These are serious questions, and are pertinent here, and will be discussed later.   If this was a case where the guilt of defendant was certain, and where no other verdict could have followed the evidence, no matter where and by whom he was tried, there would be no sound reason for reversing the case merely because the atmosphere in which he was tried was saturated with a fixed belief of his guilt.   But this is not a case of that character.   The evidence in favor of self defense was explicit, and, if the jury entertained a reasonable doubt of its truthfulness, they may have returned a different verdict.   It is unimportant what this or the trial court may think about the guilt of defendant, for that question is solely for the jury to decide, and it is therefore important that the jury should be entirely free to weigh the evidence with impartiality and with no preconceived ideas as to its truth or falsity, and uninfluenced by pressure from the outside.

The requirement of the law is not satisfied by the mere impaneling of twelve men against whom no legal complaint can be made.   The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case fairly and impartially, and uninfluenced by a preponderant sentiment that he should be flung to the lions.   It is our opinion that the record discloses this sentiment present when this case was tried, and that the defendant had no chance to secure such a jury as the law contemplates should arbitrate between the state and the defendant on trial.   The learned trial judge, surrounded by the many perplexities of a trying situation, and impressed with a laudable desire to contribute his power and influence to the enforecment of the law, strained the processes of the law, and the defendant's constitutional rights were thereby infringed.

Another thing occurred which we think should not be passed without comment. Under the circumstances surrounding this trial, if we correctly interpret them, the remarks of one of the attorneys for the state were extremely prejudicial to the defendant on trial. The remarks were: "This is no ordinary defendant. This is no ordinary case, for from the defendant's own lips on yesterday you were informed that this is not the first time the defendant has stood before a jury in Grenada county charged with dyeing his hands in human blood." This remark was improper, as other trials of defendant resulting in his acquittal can never be given in evidence against him, and this reference to the other trial could have no effect, except to remind the jury that defendant had been acquitted by one jury—that he then escaped just punishment—and this jury should see to it that he does not escape a second time. The record leads us to believe that one of the parties present at the homicide, and in company with appellant, committed suicide in the good old Western way, and by the assistance of an outraged committee of the good citizens of the community. This suicide occurred just before the trial. Need anything more be said along this line? We think not.

Returning now to the action of the court in carrying over the trial of two unfinished cases after the expiration of the term, we will consider the effect of such action upon the rights of appellant, and incidentally upon the rights of the defendant in the other case. It will be noted that the court did not discontinue the trial of the Caffey case and order a discharge of the jury, and then take up the trial of the present case. If the court entertained the belief that for any reasons of public policy it was more important to discontinue the trial of the one case and take up the trial of another case, it was within its power to have accomplished this purpose. The court did not do that; on the contrary, it attempted to retain jurisdiction

of both cases, and did, in fact, complete the trial of both after the expiration of the term.

Section 1009 of the Code of 1906 does not authorize the carrying over of more than one case. Of course, the legislature could empower the courts to adjourn from day to day until the entire dockets are completed, but section 1009 does not so provide. We think the course of action adopted by the trial court amounted to about this: It was the purpose to put appellant on trial at all hazards, and to try Caffey also, if it was possible to do so without defeating a trial of Magness. If this was the intention, the Caffey case should have been continued, because everything done after the expiration of the term in one or the other of the cases was mere *brutumfulmen*. The trial of the Caffey case had "been commenced" and was "in progress" when the term of court expired. To hold otherwise would be to hold that Caffey has not been acquitted by a jury, and therefore may be tried anew for the crime charged against him, for, under our Constitution, nothing less than the verdict of a jury on the merits can work an acquittal of a person charged with crime. Section 22, Constitution. It would be unthinkable to hold that Caffey must be tried again, but a new trial for the state is the logical sequence of a holding that the trial court had jurisdiction to try appellant after the term expired. It thus becomes clear that the learned trial judge, by his rulings, created a complication which might be very serious to a citizen acquitted by a court without jurisdiction to try his case, and, if the contention of the state in the present case is sound law, Caffey is confronted with a retrial upon the charge of murder.

There can be no criticism of any of the things precedent to the trial. It was the duty of the court to try the case at the term of the indictment, if it could be legally done, but this being obviously impossible without pretermitting a case in the progress of trial—and the court failing to

do this—it had no jurisdiction to try the present case, and sentence appellant to be hanged.

If appellant had been acquitted, instead of convicted, he could be tried anew, and all had and done in his case after the term expired was of no more legal validity than would have been a similar trial before a moot court.

*Reversed and remanded.*