## Seals *v.* State.

In Banc. Jan. 23, 1950.

No. 37176 (44 So. (2d) 61)

Tate Thigpen, Ray M. Stewart and Leopold Locke, for appellant.

238

**R. O. Arrington,** Assistant Attorney General, for appellee.

**Roberds, J.**

Seals was convicted of the murder of Frank W. Stuart and sentenced to death. On this appeal he argues a number of assigned errors 'he contends were committed in the trial of the case. One is the refusal of the lower court to instruct the jury to acquit him. That, of course, goes to the heart of the case. If he was entitled to that instruction we should reverse the case and discharge him here. Therefore, we pass upon that contention first. Seals was the only eyewitness to the homicide. He testified and gave an account of how it happened. He says this shows he acted in self-defense within the legal rule announced in Weathersby v. State, 165 Miss. 207, 147 So. 481, 482. This requires a statement of the rule and a review and an analysis of the evidence to which the rule must be applied.

The rule, as stated in the Weathersby case, is: ''It has been for some time the established rule in this

state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.''

Now, as to the evidence. Seals made two statements out of court, and testified on the stand, purporting to describe and detail the events which occurred immediately before, at the time, and after the homicide.

We quote the first statement he made:

''Statement of Leonard Seals. Sept. 27th, 1948. I, Leonard Seals, desire to make the following statement in regard to the killing of Frank Stuart in Pearl River County, Miss., on Sept. 21st, 1948.

''This statement is made freely and voluntarily on my part. No person has offered me any inducement to get me to make this statement and I have not been promised immunity from prosecution, nor any leniency and have not been coerced, or threatened, or intimidated in any manner whatever, and have been informed that I do not have to make a statement, and that any statement made by me may be used against me in a criminal prosecution.

''My full name is James Leonard Seals and I am 66 years old and live in Pearl River County, Mississippi, and get my mail at Poplarville, Miss., Route 3. I am the man who shot and killed Frank Stuart, the Game Warden, in Pearl River County, Miss., on Tuesday of last week. I pulled corn until about four or four-thirty P.M. then went to my house and got my automatic shot gun and got six ears of corn and went to the swamp and was feeding my hogs when a man walked up and told me his name was Stuart, and he was the Game Warden, and he ask me what kind of luck I was having, and I told him I was having good luck, that I had found my hogs, and I was feeding them. Then he stated he wanted to search me and I told him all right but he did not search me. I then

started to leave and he told me he would have to carry me in and I told him he was not going to carry me in, but that I would pay a fine if he would give me a receipt of which he refused to do, and after we had went about 100 yards from where he first come to me, and I had my gun on my left shoulder and I dropped the wood part of gun on my right arm and slipped the safety off with my left hand just as Stuart reached for his gun, and when he drew it on me and cocked the gun I shot him in the breast, and he raised one hand above his eyes and had pistol in other hand. I shot him again in the face, and shot him again after he fell but missed him. I then went back to my home and put my gun in the corner of the room where I always keep it. This statement has been read to me and it is the truth, and I am voluntarily making my cross mark to signature of same.

"James Leonard Seals, x (his mark)."

That recital, if uncontradicted in material respects, makes out a case of self-defense under the quoted rule, especially since it is supported by the important fact that when Stuart's body was discovered at the scene the next morning, his cocked pistol was found on the ground a short distance from his right hand.

Are there material contradictions between the statements themselves, and between them, or either of them, and his testimony on the stand?

As to the statements: The second statement is in the nature of questions and answers. It is fuller and more elaborate than the quoted statement. There are some discrepancies between them, mostly of minor importance. We will mention only two. In the quoted statement he says he and Stuart walked about 100 yards. In the second he seems to say they walked together about twenty steps. In the first account he did not give the distance between them when he says Stuart cocked and pointed his pistol at him. In the second account he says "Stuart pulled his gun and cocked it and pointed it in my face,

about five feet apart''. He also says in this recital of the events that after he shot Stuart the first time ''He stepped back two steps . . .'', which fact is not mentioned in the first statement.

Are there material contradictions between the statements and the testimony given by Seals on the stand?

In his direct testimony he said Stuart ''cocked his pistol and stooped over and was sighting down the barrel at me in a foot and a half of my face and the hammer pulled back, and he never said a word''. He said he then reasoned with himself in this manner: ''He's going to shoot me and I'll have to do something. I'll have to shoot him in self-defense to protect myself''. On cross-examination, describing the distance between them, he said Stuart ''wasn't over six feet from me''. But he also said on cross-examination, ''He throwed the pistol in my face and he was right on me. The pistol was in a foot and a half of my face.''

But more important is the question whether he was contradicted by physical facts and other evidence?

He testified time and again that Stuart had the cocked pistol pointing directly at his face when appellant shot him the first time. He said Stuart had one eye closed and with the open eye was sighting down the pistol barrel; that the first shot ''knocked him back sorter, and he checked hisself, and was looking right at me . . .''; that Stuart put his left hand over his eye, and still had the pistol in his right hand pointing directly at Seals; that he then shot him the second time; that after the second shot Stuart slowly went to the ground ''but he still held to his pistol and held it right on me . . .'', and he then fired a third time but aimed above Stuart and the shot entered the ground some ten or twelve feet beyond him. Now, appellant used a twelve gauge automatic shot gun. The first shot went in the left breast of Stuart and came out on the right side under the right arm. That shot went right through the heart. It demolished that

organ. The doctors testified that shot killed him instantly, or as quickly as one could be killed; that after receiving it Stuart could make no conscious movement, meaning, among other things, he could not possibly have continued to point the pistol at the accused. The second shot entered the right ear and lodged at the rear of the throat. The doctors testified that either shot was at once fatal. Certainly Stuart could not have continued to aim and sight his pistol into the face of Seals after he had received the second shot.

Again Seals says that just prior to the shooting he and Stuart were walking side by side. He was on the right of Stuart. In the firing of his gun he was left-handed. He says he had the barrel of his gun across his right arm. This means Stuart's right side was towards him. He asserts Stuart suddenly pulled his pistol and pointed it right into his face and Seals shot without placing the gun to his shoulder. Since the first shot entered the body of Stuart on the left side and ranged across his body to the arm pit of the right arm, the question naturally arises how it was possible, under these circumstances, for Seals to shoot Stuart in that manner from the positions of the two men as described by defendant. Stuart had his pistol in his right hand. If and when he pointed it at Seals, as Seals said he did, Stuart would have had his right side to Seals—certainly he would not have had his body further around than to permit Seals to shoot him from the front; yet this first shot entered the breast, went through the heart and came out in the right arm pit and ranged down the right arm, demonstrating the shot was fired from the left side of Stuart rather than from his right as testified by defendant. In addition to this, appellant testified, as above shown, that when he fired the second shot into the right ear of Stuart, that Stuart was standing up and was still pointing his pistol right into Seals' face. He also says he fired the gun while across his right arm, without raising it to the shoulder; yet the ear shot ranged

downward and lodged in and behind the victim's throat. From the position of the gun when fired, as Seals tells it, both shots would necessarily have ranged upwards—certainly the one into the right ear, the position of the ear naturally being from one to two feet higher than the barrel of the gun lying across the right arm of Seals.

In addition to this, defendant demonstrated before the jury, by using himself and others, the respective positions of himself and Stuart before and at the time of the shooting. The jury had the benefit of that demonstration. We do not have that. From what has been said we think it clear the jury had the right to say whether there was material conflict between the statements made by Seals out of court and his testimony given in court, and whether such conflict exists between his testimony and the other evidence in the case; whether his account of events was reasonable and whether contradicted by physical facts and facts of common knowledge.

Also, the body of Stuart, after he was killed, was left by defendant where it fell. Seals fled from the scene, illustrating, the jury might have believed, the Biblical truth that "the wicked flee when no man pursueth".

Again, Seals told no one what had happened—not even his wife. He did not notify the officers. And the next day, when the finger of suspicion pointed to him, and the sheriff and others inquired of him who did it, he, as did Cain of old after slaying his brother Abel, replied, "I know not". For six days, until he made the quoted statement, he persistently denied any knowledge of the affair. He says he was afraid. Maybe that was the reason. However, it was for the jury to deduce whether fear or a guilty conscience prompted his action. We think his guilt or innocence was a question for the jury.

██ Defendant made a motion for change of venue on the ground his case had been prejudged and that bias and prejudice against him were so strong and prevalent throughout Pearl River County that he could not obtain

a fair and impartial trial therein. The question was presented to the court at the beginning of the case, when the jury panel was tendered defendant and when selection of the jury had been completed. We will consider the question as when last presented.

This unfortunate occurrence took place September·21, 1948. Seals was indicted November 1, 1948, and was ·tried at the November, 1948, term of court.

His petition for change of venue alleged his guilt had been prejudged in Pearl River County; that the news of his arrest spread throughout the County, resulting in much ill-will and bitter feeling against him; that he was arrested and placed in jail at Picayune; a threaten_ng crowd gathered about the jail and shortly the sheriff removed him from that jail to the jail in.Hinds County to avoid violence; that the two newspapers published in Pearl River County, after defendant made the two foregoing statements dated September 27, 1948, while in the jail at Jackson, in large headlines described the statements as a confession of murder; that deceased was a member of a large influential and popular family in that County, and that defendant was poor and uneducated, with comparatively few friends. This petition was sworn to by two citizens of the county.

In support of his motion defendant introduced fourteen witnesses, one being the sheriff of the County. The Sheriff said he thought Seals could get a fair trial in Pearl River County; that Stuart was a game warden and the State Game and Fish Commission had engaged a detective to investigate the situation and find the guilty party. He admitted the deceased had numerous relatives and many friends in the County. When pressed as to the reason for his hasty removal of Seals from the jail at Poplarville, after crowds had gathered about the Poplarville jail, he said he wanted Seals in a jail where he could not talk outside to any one, and that the jailer had the jail key and took his meals at a restaurant, carried no

pistol, and he had some kind of a fear, not definite as to the reasons, that in some way the jail might be entered. He summed up the situation in these words: ''I will put it this way, Mr. Thigpen. I moved Mr. Seals for precautionary measures, and when I say that I mean in case there should at my time arise a situation where it might be dangerous for him to be here. That is one of the reasons, but at the time I moved him there wasn't any indication of anything serious arising.''

Mr. Tate Thigpen, one of counsel appointed by the court to defend Seals, testified. In substance he said he had investigated the situation in the County and found prevailing throughout the County the belief that Seals was guilty of murder; that many people knew of that feeling but were deterred from testifying in support of the motion because of that almost unanimous sentiment; that the deceased had many relatives in the County, who were people of much influence.

The other twelve witnesses who testified in support of the motion said, in more or less positive terms, they did not think defendant could get a fair trial in Pearl River County; that the public regarded the statements made by Seals as confessions of murder, and the two newspapers had so designated the meaning of the statements.

The state introduced twenty-two witnesses. One was the deputy sheriff and three were members of the board of supervisors. In substance, these four thought defendant could get a fair trial. That also may describe the meaning of the testimony of the other witnesses for the state. However, a number of these officials, as well as some of the other state witnesses, based their conclusion on the belief that the citizenship of Pearl River County was as good as any other county, and that a jury ''could be found'' in the county who would give defendant a ''fair trial''. As illustrative of this, one witness said, ''I believe we have fair minded enough people in this County to give him a fair and impartial trial.''

We now come to the conditions when the petition was last presented, i. e., when the jury panel had been completed. One hundred and fifty men were summoned on the special venire. The exact number reporting is not shown. However, out of those who did appear fifty-seven were excused because of legal excuses, illness or other like causes. Of the remainder, fifty-eight were excused because they said they had fixed opinions which could not be changed by evidence, or were so prejudiced against defendant they could not give him a fair trial.

The court then called upon the regular panel of twenty-five. Some were excused for reasons other than opinions. Out of the remainder twelve were excused because they had fixed opinions which could not be changed by the evidence or were so biased against defendant they could not give him a fair trial; seven were excused because related to Stuart. The net result of this is that approximately sixty-five per cent of the prospective jurors examined for service said they had fixed opinions as to guilt of defendant which could not be changed by evidence or which would prevent them giving accused a fair trial.

The court then summoned twenty-five tales jurors. Of this number, twelve were examined for jury service. One was related to Stuart; one was challenged peremptorily by defendant; eight said they had fixed opinion as to the guilt of defendant which evidence would not change. The twelfth said he had formed an opinion but he thought it would yield to the evidence and he could disregard it. He served, defendant having exhausted all of his peremptory challenges. That is the factual situation. It may be helpful now to revert to some of the pronouncements of this Court upon the question.

In Anderson v. State, 92 Miss. 656, 46 So. 65, 66, Judge Whitfield, speaking for the Court, said: "It will thus be seen that the substance of the testimony of the witnesses for the state, who said that they thought a fair

trial could be had, was that this was based upon their opinion of the people of Amite county, upon their faith in the good citizenship of the county, and upon their belief that sworn men would give the defendants a fair and impartial trial, if they took the oath; while some even of the state's witnesses admitted frankly that what they meant was that the defendants would have to prove themselves innocent, and that a fair and impartial jury could only be had by selecting or picking them. It is idle to talk about a fair and impartial trial to be had, on testimony such as is here set out, in the county at the time. The right to a fair and impartial trial is a sacred, constitutional right. To hold, on the testimony of the motion for a change of venue in this case, that these defendants were not entitled to a change of venue, would be to establish, as we have once before said, and now repeat, 'too dangerous a doctrine surely to find any place in a jurisprudence framed under Bills of Rights in which, in the land of their origin, the right to maintain inviolate the jury trial has been written in blood with the point of the sword as the final declaration of freemen on the subject.' ''

In Eddins v. State, 110 Miss. 780, 70 So. 898, 899, the Court said: ''The right to trial by an impartial jury is guaranteed by the organic law of the state, and when it is doubtful that such a jury can be obtained in the county of the venue of the homicide, the person on trial for his life is but asking for his rights when he requests a change of venue, there is no imaginable reason to refuse, except, possibly, a slight additional cost to the county.''

In Magness v. State, 103 Miss. 30, 60 So. 8, 10, the Court used this language: ''The requirement of the law is not satisfied by the mere empanelling of 12 men against whom no legal complaint can be made. The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case

fairly and impartially, and uninfluenced by a preponderant sentiment that he should be flung to the lions."

In Keeton v. State, 132 Miss. 732, 96 So. 179, 180, this Court said it is not enough that "12 unbiased men may be found in the county to try him. The statute contemplates that the jury shall not only be composed of unbiased and impartial men, but of men who have not been and will not during the trial be subject to the influence of a popular demand for the defendant's conviction."

Lastly, in Tennison v. State, 79 Miss. 708, 31 So. 421, 422, the Court gave utterance to this expression: "It is one of the crowning glories of our law that no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in case of the guiltiest as of the most innocent defendant answering at the bar of his country."

And to which we might add that under the Constitution of the United States and of this State, Const. U. S. Amend. 6; Const. Miss. 1890, Section 26, accused persons are entitled to a fair and impartial trial. That means fair, unprejudiced, unbiased individual jurors, who are willing to be guided by the testimony given by the witnesses and the law as announced by the Court. But, a fair trial means more than that. It means, in addition to the right to be tried by such individual jurors, the right to be tried in an atmosphere in which public opinion is not saturated with bias and hatred and prejudice against the defendant; where jurors do not have to overcome that atmosphere, nor the later silent condemnation of their fellow citizens if they acquit the accused. The ascertainment of impartial justice is, or should be, the supreme object of all courts. It is for this purpose they

exist and for which they are maintained. It is the object of the courts, as it has been the dream of the sculptors, to symbolize justice as an innocent maiden balancing in her hands the scales of justice, suspended and poised in the open light of day before the world, blinded to bias and prejudice, but ever awake to do fair and impartial justice.

We now apply these principles to the factual situation above set out. Facts are of much greater weight than opinions. How can an accused obtain a fair trial when sixty-five per cent of the jurors examined to try him say they either have fixed opinions, which cannot be changed by evidence, or they are so biased or prejudiced against him they cannot give him a fair trial? Both the State and appellant brief the case on the assumption that the prejudgment of these prospective jurors was that the defendant was guilty of murder. That, no doubt, was the understanding of the jurors who were accepted on the jury and who were in the jury box, as the examination proceeded, listening to this array of men tell the court they thought this man guilty of murder and, in many, if not most, cases that the opinions were so fixed they could not be changed by evidence. It is not conceivable this would not influence those who did serve. Taking as a measurement the percentage of the examined jurors who thought the defendant guilty, then some sixty-five per cent of all the jurors in the county had that preconceived, fixed opinion. It was impossible, in our opinion, for the accused to obtain a fair trial under these conditions. The case must be reversed and remanded for that reason.

Of course, we are dealing with the situation as presented when defendant was tried. We do not mean to intimate anything about the present or prospective sentiment in the county. Public sent ment is a fickle maiden.

Since the case is to be retried, it is necessary that we decide two other questions which will arise on such retrial.

 ██ Photographs of the deceased, showing his wounds, were introduced. Appellant says the sight of these was likely to, and did, produce sympathetic emotions in the jurors to the prejudice of defendant. That may be true, but that does not render the pictures incompetent as evidence. They, much more clearly and definitely than could oral evidence, showed the exact location, range and extent of the wounds causing the death of Stuart. Those facts were relevant in this case. The photographs were competent.

 █ The interest of the public in this matter had resulted in the employment of an able special prosecutor of defendant whose services were paid for by public contributions. Defendant moved the court to require disclosure to them of the names of all who had so contributed. The court declined to do that. Appellant says he was entitled to that information. Counsel for defendant needed that information, they contended, in the selection of the jurors. It is a serious question, and certainly not free from doubt, and we think it would have been better to have granted the request. However, we have concluded that since each prospective juror could be asked whether he had made such contribution and whether he had an opinion of the guilt or innocence of the accused, and would give him a fair and impartial trial, we would not reverse the case because of such refusal.

Reversed and remanded.

**Lee** and **Hall, JJ.**, took no part in the decision of this case.

**McGehee**, (dissenting).

The majority opinion herein contains a fair and accurate statement of the salient facts in connection with the commission of the homicide in this case from the time that the victim thereof came into the presence of the

accused in the woods on the occasion of the killing. It also correctly reveals what transpired after the body of the game warden, Frank W. Stuart, had been found; the prominence and influence of the Stuart family in Pearl River County; the size of the special venire ordered for the trial of the case; the number of special veniremen who were excused because of illness or other like causes; and the number who were excused because they stated that they had fixed opinions as to the guilt or innocence of the accused which could not be changed by evidence— a nonexistent state of mind for any person of fair intelligence and sound judgment to have, if the assertion of such a fixed opinion is to be taken literally. However, as stated in the majority opinion, it is not shown how many of the 150 men ordered summoned for special venire, actually reported for service. And it is not shown, of course, what opinions were entertained by the jurors who were excused because of illness or other like causes, or those who were summoned and did not appear; and, naturally, the record does not disclose what proportion of the fifty-eight men who were excused because they had fixed opinions, which they said could not be changed by evidence, had already decided that the defendant was guilty, or what proportion of them may have thought that he had acted in self-defense.

The defendant's statement to the officers and others, giving his own version of the killing a few days thereafter and claiming that he fired the fatal shots at a time when the game warden was trying to shoot him, and which version was not being contradicted by any eyewitness, together with the further fact that the pistol of the game warden was found on the ground at the scene of the crime, where it had been either dropped by the game warden when he was shot or had been thereafter placed by the accused, was calculated to cause a good portion of the people of the county to have a fixed opinion before the trial that the killing had been done in self-

defense. This early version given by the accused to the officers and others as to why the killing took place would naturally have been publicized over the county, along with the State's theory, when the case was being discussed, and it is not unreasonable to believe that the accused would have received the benefit of such theory of self-defense when public opinion was being formed in regard to the case prior to the trial.

But assuming, for the sake of argument, that a good majority of the jurors who stated that they had a fixed opinion, including the special veniremen and the other jurors, really intended for the trial judge to understand that they were of the opinion that the accused was guilty, and that they were not merely claiming that they had a fixed opinion in order to get off the jury panel because of the prominence or influence of either or both of the families interested, or for their own personal convenience; nevertheless, the issue as to whether or not there had been such a prejudgment of the case in the public mind against the accused as to prevent him from obtaining a fair and impartial trial was for the determination of the tr.al court on the motion for the change of venue, and unless there has been a flagrant abuse of the sound judicial discretion of the trial court in the premises, then the act:on of such court should not be disturbed on this appeal.

The proneness of many jurors to seek to get excused from jury services in such cases, for their personal convenience or comfort, or because of the standing and influence of the families interested, and to also try to avoid jury duty without regard to their open-mindedness to decide the case on the real evidence offered at the trial in such a case is well known to every experienced circuit judge; and was for the consideration of the trial judge in passing upon the motion for the change of venue in this case.

The trial judge in the instant case resides in the county where the trial was had, as shown in the forefront of

each volume of our own printed decisions for more than the past twelve years, and he has resided there practically all of his life, active in the law practice and later as circuit judge, and this is a matter of general information, at least among the judges of this State so as to be a matter of judicial knowledge, if not of common knowledge.

Therefore, the witnesses who testified on the motion for change of venue, and the jurors, were evidently well known to the trial judge. He was in all probability advised of whatever public sentiment may have existed in this largely rural county in regard to the case, and at least as much so as were the witnesses who expressed their opinions before him on the subject; and it is therefore reasonable to presume that after hearing the numerous witnesses for and against the change of venue, observing their demeanor as they were being interrogated, and knowing the attitude of prospective jurors in regard to serving on the jury, and as disclosed by their testimony on the voir dire examination, he endeavored to exercise a sound discretion and his best judgment in overruling the motion. Unless his decision is manifestly wrong and constitutes an abuse of discretion, his action should not in my opinion be disturbed. But, of course, I would not contend that merely because the trial judge lived in the county where the case was tried we should decline to reverse in a proper case where he has denied a change of venue. On the contrary, we should not hesitate to do so where the trial court clearly erred in that regard, but we should keep in mind that his local status enabled him to judge better than we as to which witnesses have given the proper version of the local situation involved. Then, too, reversals in criminal cases because of the failure to grant a change of venue, which is in the sound judicial discretion of the trial court, are infrequent unless the case presents a close question as to the guilt or innocent of the accused, and such is not the case here.

In the case of Magness v. State, 103 Miss. 30, 60 So. 8, 10, as quoted from the majority opinion herein, it is held that: "The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case fairly and impartially, . . .". I am unable to say that in the instant case there was not a fair proportion of the people qualified for jury service in the county who could try the accused fairly and impartially. And I fear that a decision, to the contrary, under the facts stated in the majority opinion may serve to enable defendants in a majority of capital cases in the future to obtain changes of venue, at greater expense to the local county, and when unnecessary to a fair and impartial trial, since it is necessarily true that the commission of an atrocious crime and the general discussion thereof that follows in the local county will inevitably have the effect of creating some prejudgment of the case in the mind of a good portion of its citizenry, even though there remains a fair proportion of the people who are qualified to give the accused a fair and impartial trial, and from which proportion an average good jury may always be selected.

The majority opinion expresses some doubt as to the correctness of the ruling of the trial court when he declined to require the prosecution to disclose to defendant's counsel the names of any contributors to the fund for the employment of a special prosecutor in the case. I think that the ruling complained of was correct, (1) because, when the right of an attorney to appear in a case is not challenged, he should not be required to divulge the facts in regard to his employment, involving the confidential relationship of attorney and client; and (2) we are not to assume that any man would be willing to sit on a jury and try a man for his life after having contributed to a fund for his prosecution.

There are other questions presented by the record which are not dealt with in the majority opinion, since it

was not necessary to deal with them in view of the conclusion reached by the majority to reverse the case because of the denial of the change of venue,. and I, therefore, am likewise refraining from expressing an opinion on any of the other questions assigned as alleged error.

Perhaps I am influenced, to some extent, in dissenting from a reversal of the case, and especially on the ground stated in the majority opinion, by the fact that in looking back over the completed trial, it does not appear that the denial of the change of venue resulted in the defendant not getting a fair and impartial trial, or in an unjust conviction. In addition to the facts set forth in the majority opinion, it also appears that almost immediately before the shots were fired whereby the game warden was killed, some of the witnesses had heard some shooting in the woods in close proximity to the scene of the crime, and the jury was entitled to conclude reasonably that these previous shots had attracted the game warden to the scene, that he found the accused in possession of game, and was conducting him away in the performance of an official duty for the purpose of preferring charges against him for the violation of the game laws, and that thereupon the accused decided that by leaving the game warden dead in the woods, he would avoid such prosecution; and that this was evidenced by the further fact that the defendant did not at first report the killing as having been done in self-defense, but for six days thereafter he concealed the fact that he had any knowledge of the killing at all. Then too, he was wholly contradicted by the physical facts in saying that he shot the game warden twice while the latter was facing and trying to shoot him, since the first and fatal shot went through the heart of his victim, and the other ranged from immediately behind his ear, and downward.

I am in full accord with the majority view that if a constitutional right of an accused has been violated by the denial of a change of venue, thereby preventing a

fair and impartial trial of his case, he would be entitled to a reversal of his conviction without regard to how conclusively his guilt may have been shown. But, under all of the facts and circumstances, I am of the opinion that the ruling of the trial court on the motion for a change of venue did not have the effect of violating any constitutional right of the accused, and that the case should not be reversed on that account.