476 So.2d 1195 (1985)
Leon JOHNSON
v.
STATE of Mississippi.
No. 55937.
Supreme Court of Mississippi.
September 25, 1985.
*1197 J. Richard Barry, Bourdeaux & Jones, Meridian, Joseph W. Hutchinson, III, Butler, Ala., for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Williams S. Boyd, III and Marvin L. White, Jr., Sp. Asst. Attys. Gen., Jackson, Charles Wright, Meridian, for appellee.
En Banc.
Leon Johnson was indicted in the Circuit Court of Lauderdale County for capital murder. In a bifurcated trial, Johnson was found guilty of capital murder in the guilt phase and the case proceeded into the sentencing phase before the same jury, with Honorable Henry Palmer presiding. At the conclusion of the sentencing phase, the jury retired to the jury room, deliberated and returned into court a verdict imposing the death penalty on Johnson. He has appealed to this Court and assigns twenty-two (22) errors in the trial below.
*1198 The judgment of the lower court will be reversed by a majority of this Court, and the cause remanded for a new trial because of failure to sustain a motion for change of venue. Part I will address twenty-one (21) assigned errors, one of which pertains to the sentencing phase, since they may arise in the new trial. Part II will address the motion for change of venue.

PART I.
ROY NOBLE LEE, Presiding Justice, for the Court:

Introduction
On December 4, 1982, around 8:30 in the morning, the Super Stop convenience store located at the corner of Eighth Street and 29th Avenue in the City of Meridian, was robbed and Mrs. Eileen Grogan, the attendant, was brutally murdered. Her body was discovered in the back room of the Super Stop, nude from the waist down with her bra and shirt pulled up under her chin. The victim's underclothes were never located. According to the pathologist, who examined the body, Mrs. Grogan had been struck on the head with a blunt object causing a depression fracture to the skull. She had experienced sexual intercourse at some undetermined period of time prior to her death. The cause of death was established as strangulation.
The Meridian Police Department received a call from a customer of the Super Stop, who had become suspicious, around 8:30 on the morning of the homicide, indicating to the police that a black male had waited on him; that the person didn't know how to use the cash register; and that he didn't know the prices of some of the merchandise. The first officer to arrive at the scene was Carl Molony. When he entered the store, the black male took the officer's gun and shot Molony twice with it, seriously injuring him. Molony managed to radio to the police department for more assistance, which was immediately forthcoming. The store was surrounded, tear gas was thrown into it, the fire department was called, and a hole was cut through a wall into the back room where Mrs. Grogan's body was found. Officer Molony survived the gunshot wounds inflicted on him, but was unable to remember what occurred.

GUILT PHASE

I.

THE VERDICT OF THE JURY AS TO GUILT AND SENTENCE IMPOSED IS AGAINST THE OVERWHELMING WEIGHT OF CREDIBLE EVIDENCE, AND THERE IS INSUFFICIENT EVIDENCE FOR THE JURY TO BASE A FINDING OF GUILT AND SENTENCE BEYOND A REASONABLE DOUBT AND TO THE EXCLUSION OF EVERY OTHER REASONABLE HYPOTHESIS CONSISTENT WITH INNOCENCE.

II.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR A DIRECTED VERDICT AS TO ROBBERY.

III.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO GRANTING INSTRUCTION C-38.

IV.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION FOR A DIRECTED VERDICT AS TO CAPITAL MURDER.

V.

THE LOWER COURT ERRED IN GRANTING INSTRUCTIONS C-1 AND C-2.
The five assignments of error stated above apply to the questions of whether or not a directed verdict should have been granted in those areas of the trial and whether or not the evidence was insufficient to establish guilt. They will be consolidated and addressed together.
*1199 Naomi Shadow testified that she bought a coke in the Super Stop between 8:00 and 8:30 on the morning of December 4, 1982. Ms. Grogan was there at the time, and Ms. Shadow did not see anyone else in the store. Kevin Bartley testified he went into the store at about the same time and Mrs. Grogan waited on him. He did not see appellant in the store.
Herbert Smith entered the Super Stop prior to 8:30 that morning to buy beer for an elderly friend, who lived across the street. He identified appellant as the person who waited on him. Smith noticed that appellant had an orange Super Stop jacket draped over his right shoulder. There was blood on the jacket. When Smith paid for the beer, appellant stepped over to the cash register as if to open it, but didn't. He then stepped back and made the change out of a roll of money in his shirt pocket.
After leaving, Smith watched the Super Stop from a window at his friend's house across the street. He saw Officer Molony go in and look around, but could not see appellant. Molony then opened the door and stepped into a back room. A few seconds later, he came "flying out backwards" from that room, appellant came out behind him, Smith heard two shots fired, and appellant left.
Tommy Hill and his brother, Jack Amison, stopped at the Super Stop and Hill went in. There was no one in the store at the time. A policeman came in looking around. Hill lost sight of him when he went behind the counter. He then heard a shot and saw a tall black man leaning against the wall. While Hill was running out, he heard another shot. The gunman followed him out and said, "You haven't seen me, man." Hill described that person as wearing a gray pullover sweater and gray pants. He then identified appellant as the man with the gun. Hill is a local bootlegger with numerous convictions for liquor violations. He did not come forward with his information until the end of January, 1983. The murder occurred on December 4, 1982. There was a large reward being offered by that time. Jack Amison did not go in the Super Stop, but heard gunshots and saw his brother, Tommy Hill, run out followed by appellant. He also identified appellant.
Ricky Walters drove by the Super Stop that morning and saw an empty police car and a white truck (Hill and Amison were driving a white truck), but no people. He kept driving down the street and a "kind of faded brown like" Torino pulled out in front of him. About that time, the rest of the police arrived on the scene.
Mitsi Harris worked in a sporting goods store down the street from the Super Stop at the time of the murder on December 4, 1982. She was looking out the window and saw a yellow car pull in the parking lot. A black male about 6' tall and wearing dark pants and a dark shirt got out and walked toward the Super Stop. She identified him as Johnson. Ms. Harris looked into the parking lot and saw that the car was a yellow Torino with Alabama plates. About 10 minutes later, several black males came running back by the window, but she was not sure if the first man was with them.
Danny Brown, deputy sheriff, Choctaw County, Alabama, testified that on the morning of December 4, 1985, the sheriff's office received a call from the Meridian Police Department to be on the lookout for a yellow and black Torino with Alabama plates. He observed such a vehicle about 9:30, after stationing himself on the highway coming from Mississippi. He did not stop the car, however, because he recognized it as belonging to Fred Johnson (father of appellant), whom he knew well.
Officers searched the Johnson home on December 21, 1982. Appellant, his father, Fred Johnson, grandfather, Amos Johnson, and his grandmother, all lived together. Taken in the search were a pair of gray wool pants, a grayish black knit pullover velour-type shirt, a pair of jeans, and two belts. These clothes were on a hanger inside a cleaning bag.
George Reese, a local schoolteacher, testified that he met appellant on the street the night of December 3, 1982, and they slept in Reese's car that night. Appellant gave him his address and Reese gave appellant *1200 a false address. The address note was introduced in evidence. He also gave appellant $5.00. They woke up around daylight. Reese said that appellant was wearing a steel grayish-blue velour pullover sweater shirt and gray pants. He did not know appellant prior to that night. Although he claimed to have given appellant the money out of sympathy, it was indicated, during cross-examination, that the money was for sexual favors.
Larry Turner, a forensic serologist with the Mississippi Crime Lab, determined from the semen recovered from the vaginal tract of Mrs. Grogan that it came from a person with Type B blood, secreter status. Appellant was found to be a Type AB, secreter status.[1]
Thirteen (13) latent fingerprints were lifted from the Super Stop and sent to the Mississippi Crime Lab. Only eight (8) of them were identified. One was identified by Ron Smith of the Mississippi Crime Lab to be appellant's fingerprint. It was found on a door facing inside the Super Stop. Smith testified that a red substance found on the print was blood, but he was unable to determine the type. Due to the manner the blood was on the ridges of the fingerprints, he was able to determine that the blood had been on appellant's hand when he touched the door facing, rather than the blood having been on the door facing when appellant put his hand on it. However, Smith was not able to determine when the print was made.
Appellant's defense was an alibi. He did not refute that he was in Meridian on the night of December 3, 1982, but introduced evidence that he was at home in bed on the morning of December 4. He did not testify in his own behalf.
Appellant's father, Fred Johnson, and grandparents testified that appellant was asleep at home early on the morning of December 4. Fred Johnson testified that he went to the town of Butler, Alabama, in the Torino car that morning. He left home between 8:30 a.m. and 9:00 a.m. Beatrice Phillips testified she rode with him and they left her house between 8:00 and 9:30.
In addition to other shopping, Fred Johnson purchased some vodka for another person. His receipt from the liquor store indicated that he bought it at 10:15 on the morning of December 4. Johnny Crump, the liquor store clerk, testified that Fred Johnson was in his Torino car at the time. On cross-examination, Crump said that he noticed the car parked in the lot when he came to work about 8:30.
Tommy Portis testified for the defense that he and appellant had gone to Meridian on the Tuesday (November 30, 1982) before December 4 (Saturday), and had stopped at the Super Stop to get some gas. He said appellant went inside and Portis stayed with the car. On cross-examination, it was revealed that Portis had talked to the police on December 23, 1982. Officers S.A. Thomas and Lou Robbins both testified that Portis told them he went in the store and appellant stayed in the car. Portis denied having said this.
Christopher Chapman testified for the defense that he was a customer in the Super Stop on the morning of December 4; that a black male with a mole over his left eye and a gold earring waited on him; and that appellant was not that man. On cross-examination, he also said that the person was wearing gray pants and a short-sleeve gray pullover shirt.
Paul Kidd, who originally alerted the police, testified for the defense. It was through Kidd's description that the officers were able to prepare a composite of the accused, which bore a striking resemblance of him, and from which at least one individual recognized appellant. Kidd said that the person who waited on him had a finger on his left hand which was tapered like it had been stuck in a pencil sharpener. Kidd testified that appellant was not the person who waited on him.
Herbert Smith viewed a lineup in Butler, Alabama, on December 21, 1982, in which appellant participated. He positively identified appellant as the individual he saw in the Super Stop on December 4, 1982. Mitsi *1201 Harris identified appellant on December 22, 1982, from a photo lineup as the person she saw on December 4, 1982, who parked the Torino where she worked. These individuals made an in-court identification of appellant.
As stated before, the general issue here raised the questions of (1) insufficiency of the evidence; (2) whether the lower court should have granted a directed verdict as to robbery; (3) whether or not the lower court should have granted Instructions C-1 and C-2, peremptory instructions on the issue of capital murder; and (4) the lower court should have granted Instruction C-38 submitting the question of robbery to the jury. In reviewing the questions and issue presented here, this Court has held many times, and it is elemental, that the Court looks to all evidence supporting or tending to support the verdict, together with all inferences that may be reasonably drawn from such evidence. Also, it is an elemental principle of criminal law that a conviction may be had on circumstantial evidence alone.[2]Tolbert v. State, 407 So.2d 815, 820 (Miss. 1981); Aldridge v. State, 398 So.2d 1308 (Miss. 1981).
In Hammond v. State, 465 So.2d 1031 (Miss. 1985), this Court again stated the rule pertaining to peremptory instructions and directed verdicts in criminal cases as follows:
The rule for considering motions for directed verdicts and requests for peremptory instructions in criminal cases is stated in Warn v. State, 349 So.2d 1055 (Miss. 1977):
Peremptory instructions should be refused if there is enough evidence to support a verdict....
The law regarding peremptory instructions in Mississippi is stated in Cochran v. State, 278 So.2d 451, 453 (Miss. 1973):
The rule in regard to a peremptory instruction is the same in criminal and civil cases, the rule being that when all the evidence on behalf of the state is taken as true, together with all sound or reasonable inferences that may be drawn therefrom if there is enough to support a verdict of conviction, the peremptory instruction must be denied.

See also Jackson v. State, 440 So.2d 307 (Miss. 1983); Gray v. State, 387 So.2d 101 (Miss. 1980); Rich v. State, 322 So.2d 468 (Miss. 1975); McGee v. Coccaro, 261 So.2d 465 (Miss. 1972); and Carroll v. State, 196 So.2d 878 (Miss. 1967).
465 So.2d at 1035.
As to the question of proof on robbery, it indicates that the appellant was identified as being present on the occasion of the homicide, he was behind the counter "waiting" on customers, he had a large amount of cash on him, and over three hundred dollars ($300.00) was taken from the Super Stop.
We are of the opinion that a guilt question was presented for the jury to determine whether a robbery and capital murder were committed and as to whether appellant was the person who committed the crime.

VI.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION TO STRIKE AND QUASH THE UNCONSTITUTIONAL MISSISSIPPI STATUTES PROVIDING FOR THE IMPOSITION OF THE DEATH PENALTY IN THE APPLICATION OF THIS CASE.
Appellant contends that Mississippi's capital murder statute is unconstitutional because it is arbitrarily and indiscriminately applied; that the death penalty is cruel and inhuman punishment and is in violation of the Eighth and Fourteenth Amendments of the United States Constitution; and that it is imposed at the discretion of the jury without fixed standards to guide the jury. Appellant's argument has been rejected by this Court and by other jurisdictions. Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); United States v. Patterson, 724 F.2d 1128 (5th Cir.1984); Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982); Hoback v. Alabama, 607 *1202 F.2d 680 (5th Cir.1979); Bullock v. State, 391 So.2d 601 (Miss. 1981); Coleman v. State, 378 So.2d 640 (Miss. 1979). Likewise, we reject it here.

VII.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO IMPANEL A SEPARATE JURY FOR THE GUILT AND PUNISHMENT PHASES OF THE TRIAL.
Mississippi Code Annotated § 99-19-101 (Supp. 1984) provides that the same jury impaneled in the guilt phase of a capital murder case should be used to determine sentence, unless there are unforeseeable circumstances or the trial court is either unable, or it is not possible, to reconvene the jury. The question has been determined and rejected in Jones v. State, 461 So.2d 686 (Miss. 1984), and Billiot v. State, 454 So.2d 445 (Miss. 1984). See also Smith v. Balkcom, 660 F.2d 573 (5th Cir.1981); and Jordan v. State, 464 So.2d 475 (Miss. 1985).

VIII.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION FOR FUNDS TO HIRE AN INVESTIGATOR TO AID IN PREPARATION OF HIS DEFENSE, WHICH DENIED THE DEFENDANT DUE PROCESS OF LAW.

IX.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION FOR FUNDS TO EMPLOY AN INDEPENDENT FINGERPRINT EXPERT, WHICH DENIED DEFENDANT DUE PROCESS OF LAW.

X.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION FOR FUNDS TO EMPLOY AN EXPERT TO EXAMINE BLOOD AND SEMEN SAMPLES, WHICH DENIED DEFENDANT DUE PROCESS OF LAW.
The three assignments of error here are covered by the same test. The issue was pending before the United States Supreme Court, which granted certiorari in Caldwell v. Mississippi, ___ U.S. ___, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984), when the case sub judice was submitted. Caldwell was decided by the United States Supreme Court June 11, 1985, [___ U.S. ___, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)] and the judgment of this Court was reversed on trial argument of the district attorney, not on the question here involved. The Court denied certiorari on the same issue in Dufour v. Mississippi, ___ U.S. ___, 105 S.Ct. 1231, 84 L.Ed.2d 268 (1985) and Billiot v. Mississippi, ___ U.S. ___, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985), leaving undisturbed our holding that the Constitution does not require a State to furnish an indigent defendant with expert or investigative assistance upon demand. We recognize that the doctrine of fundamental fairness, guaranteed by the Due Process Clause of the Constitution, at times requires authorization for appointment of a particular expert or investigator. Ruffin v. State, 447 So.2d 113 (Miss. 1984), stated Mississippi's position on the question as follows:
There is no merit in this assignment of error. That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare. See: U.S. v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1952); U.S. v. Pennsylvania, 452 F.2d 557 (3rd Cir.1971); Aldisert, C.J., p. 563; State v. Grant, 560 S.W.2d 384 (Mo. 1977); Graham v. State, 547 S.W.2d 531 (Tenn. 1977); and State v. Montgomery, 291 N.C. 91, 229 S.E.2d 572 (N.C. 1976).
As aptly stated in Oregon v. Acosta, 41 Or. App. 257, 597 P.2d 1282, 1284 (1979):
It is apparent that an indigent's statutorily enacted right to defense expenses is not absolute, but is conditioned *1203 upon a showing that such expenses are needed to prepare and present an adequate defense. (Citations omitted) Neither the statute nor the constitutional guarantees of effective assistance of counsel and of equal protection require that an investigator or expert be furnished at public expense upon demand.
(Citations omitted) There is no single test for determining whether the services of an investigator or an expert are necessary; that decision will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed. (Citations omitted) [Emphasis added.]
See also, 34 A.L.R.3rd 1256, §§ 7 through 17.
447 So.2d at 118.
Whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial must be weighed on a case-by-case basis. Bullock v. State, 391 So.2d 601 (Miss. 1980); Davis v. State, 374 So.2d 1293 (Miss. 1979). The majority of state and federal jurisdictions express a similar view and hold that relief will be granted only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and his trial was thereby rendered fundamentally unfair.
The record in the case sub judice reflects that appellant's counsel had full access to the experts of the State, together with the investigation and the reports of those experts. Counsel were able to subject them to rigid cross-examination. There is nothing to indicate that the State experts were biased or incompetent. In our opinion, appellant was not prejudiced for failure of the lower court to provide him funds with which to obtain his own experts, nor has he suffered any disadvantage thereby. Therefore, we are of the opinion that the lower court did not abuse its discretion in declining to provide appellant's counsel with requested experts and reversible error was not committed.[3]

XI.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR A PERMANENT INJUNCTION (GAG ORDER) ENJOINING THE NEWS MEDIA FROM ANY IMMEDIATE COVERAGE OF ALL PRETRIAL MOTIONS AND HEARINGS, AND THE DENIAL OF SAID MOTION MADE IT POSSIBLE FOR THE RELEASE OF INFORMATION TO THE PUBLIC, THE EFFECT OF WHICH ULTIMATELY DENIED THE APPELLANT THE OPPORTUNITY TO SELECT A FAIR AND IMPARTIAL JURY.
On January 13, 1984, appellant filed an application for permanent injunction seeking the following:
A permanent injunction should be issued against the District Attorney and his staff, all local or state law enforcement personnel enjoining them from in any way communicating about this case to the press or any other individuals except among themselves to prepare for this case, and to further enjoin the new [sic] media from any media coverage of all pretrial motions and hearings held in this cause.
After an evidentiary hearing, the lower court sustained the motion in part, enjoining the prosecutors and anyone else associated with the prosecution or defense from communicating with the news media about the case. The court declined to issue an injunction against the media coverage. A close perusal of the motion indicates that appellant was attempting to enjoin the news media from publishing anything about the case. The lower court apparently treated the motion as an attempt to keep media representatives from being present at any of the hearings. In denying that *1204 part of the motion, the lower court indicated it would consider any questions of admissibility in chambers, if requested.
In Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), it was indicated that, in certain situations, the trial judge has the authority to close pretrial hearings to the press at the request of the defendant. However, the Court did not go so far as to issue an injunction against the news media subsequent to the hearing at which the public was excluded. The press had full access to transcripts and records and were able to report events as they transpired.
We are of the opinion that the lower court did not abuse its discretion in declining to issue an injunction against the news media.

XII.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO APPOINT AN EXPERIENCED CRIMINAL TRIAL ATTORNEY IN THIS MATTER, THEREFORE, DENYING THE APPELLANT EFFECTIVE ASSISTANCE OF COUNSEL.
Appellant argues that the lower court erred in refusing to appoint "experienced trial counsel" to represent him in the trial below. At the outset, the trial judge appointed a lawyer in Butler, Alabama, to represent appellant. He graduated from law school in May, 1983. That attorney promptly filed a motion for appointment of co-counsel and another attorney, who had been practicing law for approximately four and one-half (4 1/2) years and who was one of the few attorneys in the area to defend a capital murder case, was appointed. United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), is the guiding star of legal jurisprudence on this question. Cronic was charged with mail fraud in connection with a check kiting scheme. His appointed attorney had a real estate practice with no prior experience in conducting jury trials. The court held that, to prevail on an effectiveness claim, Cronic must point to specific lapses by his trial counsel. The appellant has made no attempt to do so in the case sub judice, obviously because he cannot. In his closing remarks to the parties, the trial judge stated he had never seen anyone do a better job than was done by the attorneys representing the appellant.
Counsel is presumed to be competent. If counsel is reasonably effective in the defense of an accused, he meets constitutional standards, irrespective of the client's evaluation of his performance. An indigent criminal defendant is not entitled to expert counsel, or to counsel of his own choosing, but only to reasonably effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

XIII.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS A SUGGESTIVE LINE-UP AND PICTURES THEREOF IN WHICH THE APPELLANT WAS A PARTICIPANT.
Appellant complains that the testimony of William Clark, Herbert Smith, Freddie Watson, Douglas Jones, Jr. and Mitsi Harris was impermissibly suggestive, and should have been suppressed. Watson and Clark were not called as witnesses at the trial.
Smith testified that prior to a lineup in Butler, Alabama, the witnesses had been instructed not to discuss the case among themselves. They were handed a form to fill out and to indicate on the form whether they could or could not identify any of the participants. They were taken individually into the courtroom (where the lineup stood). Each of the participants was dressed alike. Smith testified he identified # 1 in the lineup as being in the store on December 4; that # 1 was the man who had waited on him, and was Johnson the appellant; that no one suggested in any manner whom he should select; that he had been able to observe the appellant in *1205 the store at least three to five minutes; and that he had not previously identified anyone.
Jones also viewed the lineup in Butler, Alabama, and he identified appellant as the person he saw in the Super Stop on December 4. He did not know any of the participants in the lineup and he was positive appellant was the man he observed behind the counter. The appellant was not over three to four feet away from him and he observed appellant over two minutes in the store; and his attention was particularly attracted by the blood on the jacket slung over appellant's shoulder.
Harris testified that she was working in the store next door to the Super Stop and observed appellant walk in front of her place of employment and get into a yellow Ford Torino. She described the clothes he was wearing and she identified appellant from the photographic lineup. Harris identified appellant in the courtroom as the one she saw on December 4, as did Smith and Jones.
Tommy Hill was called as a witness and positively identified Johnson as the man he saw on December 4 (Jack Amison also). No objection was interposed to their testimony and they did not view any of the lineups.
In Bankston v. State, 391 So.2d 1005 (Miss. 1980), the Court said:
In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court held that even if the pretrial identification procedure had been unnecessarily suggestive the identification did not have to be excluded if upon consideration of the totality of the circumstances there was no substantial likelihood of misidentification. The Court set out five factors to be used in analyzing the totality of circumstances. These factors include:
(1) The opportunity of the witness to view the criminal at the time of the crime;
(2) The witness's degree of attention;
(3) The accuracy of his prior description of the criminal;
(4) The level of certainty demonstrated at the confrontation; and
(5) The time between the crime and the confrontation.
(432 U.S. at 110-14, 97 S.Ct. at 2250-53, 53 L.Ed.2d at 151, 153, 154).
391 So.2d at 1008.
Under the test expressed above, we are of the opinion that the lower court did not commit error or abuse its discretion, in declining to suppress the lineup pictures and identification evidence.

XIV.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS STATEMENTS GIVEN BY THE APPELLANT TO LAW ENFORCEMENT AGENCIES.
When arrested, appellant gave a statement to police wherein he admitted being in Meridian, Mississippi, on the night of December 3, 1982, but stated that he returned to Butler, Alabama, early in the morning. After an evidentiary hearing, the lower court declined to suppress that statement. We will not discuss the assignment further, since the statement was not introduced at trial.

XV.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS AND EXCLUDE CERTAIN ILLEGALLY SEIZED ITEMS AND CLOTHES TAKEN FROM THE HOME OF THE APPELLANT'S GRANDFATHER LOCATED IN PUSHMATAHA, ALABAMA.
On December 21, 1982, appellant consented to the search of the dwelling where he lived with his parents and signed two consent forms for the search of that home and the Torino automobile. In addition, he was orally advised of his rights to decline permission for the search. Likewise, his grandfather, owner of the dwelling house, gave his consent for the search. Appellant's clothes, which had been recently cleaned, and were similar to the clothes witnesses described he was wearing on December *1206 4, 1982, were taken and introduced into evidence. We are of the opinion that the search was knowingly and intelligently authorized and that there was no violation of his constitutional rights, federal or state. Penick v. State, 440 So.2d 547 (Miss. 1983); Quan v. State, 185 Miss. 513, 188 So. 568 (1939); Smith v. State, 133 Miss. 730, 98 So. 344 (1923).

XVI.

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION IN LIMINE RELATING TO GRUESOME PHOTOGRAPHS SUBMITTED INTO EVIDENCE IN THE TRIAL AND USED AS EVIDENCE IN THIS CAUSE.
Appellant complains that photographs of the victim, three in number, were cumulative, prejudicial and inflammatory. Dr. Arthur Martin, the pathologist, referred to the photographs and used them to explain how death was inflicted and to point out the extent of certain wounds (victim was struck with a blunt instrument on the head and then death ensued by strangulation). We are of the opinion that the photographs had probative value and that they were not so distorted and gruesome as to be prejudicial and inflammatory. The lower court did not abuse its discretion in admitting the photographs into evidence. See Dufour v. State, 453 So.2d 337 (Miss. 1984); Smith v. State, 419 So.2d 563 (Miss. 1982); Edwards v. State, 413 So.2d 1007 (Miss. 1982); Bullock v. State, 391 So.2d 601 (Miss. 1980); Voyles v. State, 362 So.2d 1236 (Miss. 1978); Irving v. State, 361 So.2d 1360 (Miss. 1978).

XVII.

THE LOWER COURT ERRED IN FAILING TO SUSTAIN THE MOTION OF APPELLANT TO QUASH THE PETIT JURY PANEL BECAUSE THE JURY SELECTION PROCESS EXERCISED BY THE STATE WAS DISCRIMINATORY AND UNCONSTITUTIONAL.
Appellant contends that he was denied a fair trial because the prosecution used its peremptory challenges to exclude blacks from the jury. All twelve challenges were exercised by the prosecution and the jury panel consisted of ten whites and two blacks. In passing upon the question of systematic exclusion of jurors (blacks here) and the exercise of peremptory challenges, this Court has steadfastly followed the rationale in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). See Belino v. State, 465 So.2d 1043 (Miss. 1985); and Booker v. State, 449 So.2d 209 (Miss. 1984). The Fifth Circuit Court of Appeals in Prejean v. Blackburn, 743 F.2d 1091 (5th Cir.1984), continued its adherence to Swain. We are not persuaded that the principle established in Swain and subsequent decisions should be rejected.

XVIII.

THE LOWER COURT ERRED IN ALLOWING INTO EVIDENCE THE TESTIMONY OF STATE WITNESS, DEAN CARMICHAEL, CONCERNING THE BUSINESS RECORDS AND LOSS OF JUNIOR FOOD STORES, INC., A MISSISSIPPI CORPORATION, D/B/A SUPER STOP.
Dean Carmichael, area manager for Super Stop, Inc., testified for the purpose of establishing the amount of money taken from the store on December 4, 1982. He stated that a report is made daily to show the sales for that date, any disbursements, and the amount of cash on hand at the end of the day, and that each store starts the day with $400.00 in cash. The total sales, according to him, on December 4, of gas and merchandise were $628.90, and $58.14 in money orders were sold. These amounts combined with the $400.00 beginning figure, aggregate $1,107.31 cash on hand. However, there was only $797.42 after the robbery, which showed that $309.89 was missing.
Carmichael testified from records, which were prepared by several different Super *1207 Stop employees. He testified that they were regularly-kept records of the Super Stop over which he had supervision and control. The records were marked for identification, but were not admitted into evidence. The record seems to indicate that appellant's counsel never objected to the documents being introduced (R. 1744), which, in the least, would have amounted to a waiver of the introduction. The ruling of the court follows:
BY THE COURT:
Well, my understanding of what happened here is that this Exhibit K has now been identified as the record that the witness has testified about. It is hearsay and the question is whether or not it is an exception to the hearsay rule. I've ruled that the witness may testify from it and it's your wish it becomes evidence, but the reason for that is that he testified that in his position as manager or area manager that he was in control or the custodian of those records. He's identified it and how it was prepared. He stated that it was made in the regular course of business, made at regular intervals at or near the time that the content of the record came into being, that is, daily. And, because of that and because of the inherent reliability of this type evidence being systematically made in the ordinary course of business and this man being responsible for them, I rule that it is an exception to the hearsay rule irrespective of the fact of whether he actually made the notations or not since he is custodian and they are in his charge. So, your record, your obligations, your citations are protected, Mr. Barry, but the objection is overruled. Anything else outside the presence of the jury?
In Ross v. Miller, 441 So.2d 541, 542 (Miss. 1983), the Court, in discussing the admissibility of records kept in the normal course of business, said:
In Grenada Cotton Compress Co. v. Atkinson, 94 Miss. 93, 47 So. 644 (1908), this Court held business records admissible as an exception to the hearsay rule. See also King v. State ex rel. Murdock Acceptance Corp., 222 So.2d 393 (Miss. 1969). In Grenada, supra, we held business records admissible even though some of the witnesses testifying did not make the entries, and "did not have personal knowledge of the matters about which their testimony was given, but relied upon the books for their evidence." Id. 94 Miss. at 100, 47 So. at 646. In holding that the records should be admitted we approved the treatise which states:
The conclusion is, that where an entry is made by one person in the regular course of business, recording an oral or written report, made to him by one or more other persons in the regular course of business, of a transaction lying in the personal knowledge of the latter, there is no objection to receiving that entry under the present exception, provided the practical inconvenience of producing on the stand the numerous persons thus concerned would in the particular case outweigh the probable utility of doing so. [Wigmore on Evidence, § 1530].
441 So.2d at 542.
The trial judge determines the admissibility of evidence in his sound discretion, and, unless he abuses that discretion to the extent that it is prejudicial to the accused, his ruling will not be reversed. We are of the opinion that the lower court did not commit error in admitting this evidence.

XIX.

THE LOWER COURT ERRED IN ALLOWING INTO EVIDENCE EXHIBIT 24 AND EXHIBIT "O" AND "T" FOR IDENTIFICATION, WHICH HAD BEEN PREVIOUSLY INTRODUCED INTO EVIDENCE AND WERE WITHDRAWN WHEN EXHIBIT 24 WAS INTRODUCED, AND THE TESTIMONY OF STATE'S WITNESS LARRY TURNER CONCERNING THE HUMAN BLOOD CONTAINED ON SAID EXHIBITS.
Larry Turner, a forensic serologist, and Ron Smith, a fingerprint examiner, *1208 both with the Mississippi Crime Laboratory, were called as witnesses for the State. Turner testified that there was human blood on the fingerprint lifted from the door facing but there was not enough blood to determine the type. Smith testified that the blood was originally on appellant's finger and not on the wall. Appellant contends that the testimony of those witnesses was irrelevant and unduely prejudicial and cites Shearer v. State, 423 So.2d 824 (Miss. 1983).
In Shearer, the accused had been convicted of murder for the death of a neighbor and the proof indicated that Shearer killed her to avoid identification when caught in the act of burglarizing her home. A pair of pants with blood on them was admitted in evidence, but the amount of blood was so small that it could not be typed or even identified as human blood. This Court held that the lower court did not abuse its discretion in admitting the pants in evidence, but indicated that in a different case, it could be reversible error. [423 So.2d at 824].
In the case sub judice, the blood was identified as human blood but could not be typed. This is a much stronger case on the question than Shearer and the lower court did not abuse its discretion in admitting the testimony.

XX.

THE LOWER COURT ERRED IN ALLOWING INTO EVIDENCE THE CUMULATIVE STATEMENT OF STATE'S WITNESS, RAYMOND GROGAN, CONCERNING HIS TESTIMONY OF EXHIBITS 2 AND 3, LATER INTRODUCED INTO EVIDENCE.
Raymond Grogan, son of the victim and a member of the Meridian Police Department, was one of the officers responding to the call and complaint relating to the Super Stop on December 4, 1982. He testified and established who was working at the store, where and how the body was found, and the condition inside the store. He was not emotional, nor did he shed tears. The testimony had probative value and Evans v. State, 422 So.2d 737 (Miss. 1982), and Booker v. State, supra, are dispositive of the appellant's contention that the testimony was cumulative and prejudicial.

SENTENCE PHASE

XXI.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL DURING THE SENTENCING PHASE WHEN THE STATE QUESTIONED A DEFENSE WITNESS CONCERNING A PRIOR CONVICTION OF THE APPELLANT WHICH HIGHLY PREJUDICED THE JURY AGAINST THE APPELLANT.
The appellant did not testify in the trial below. He contends that the lower court committed error in admitting into evidence at the sentencing phase the fact that he had a prior conviction for rape, a crime of violence to the person. Mississippi Code Annotated § 99-19-101 (Supp. 1984), provides that prior convictions of violent crimes constitutes an aggravating circumstance. See also Coleman v. State, 378 So.2d 640 (Miss. 1979); Jackson v. State, 337 So.2d 1242 (Miss. 1976).
The jury verdict unanimously found three aggravating circumstances, one of which was that "(3) the defendant was previously convicted of a felony involving the use or threat of violence to the person." This assignment of error is without merit.

PART II
DAN M. LEE, Justice, for the Court:
THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR CHANGE OF VENUE IN THIS CAUSE AS THERE WAS EXTENSIVE PRETRIAL PUBLICITY IN MEDIA COVERAGE OF THE FACTS AND EVIDENCE SURROUNDING THIS CASE, WHICH DENIED THE APPELLANT *1209 THE OPPORTUNITY TO OBTAIN A FAIR AND IMPARTIAL JURY.
One of the functions of the law is to provide a consistent and constant set of guidelines for society; indeed, our fundamental common law doctrine of stare decisis is intended to achieve that very end. Nonetheless, our commitment to selective precedent must not become perfunctory, else we be likened to the draft animal under blinders, seeing only that which is immediately before us and failing to broaden our vision. We must occasionally refresh our consideration of the reason behind the rule, the purpose behind the precedent.
It has been aptly and ably noted that the decision to grant a motion for a change of venue rests largely within the sound discretion of the trial judge. Little emphasis is given to the accompanying concept that the trial judge may sometimes, unintentionally, abuse that discretion. No effort has been made to provide the trial court with guidelines to be employed when making such a determination, criteria that would help assure that every trial be, not perfect, but fair.
A fair trial is, after all, the reason we have our system of justice; it is a paramount distinction between free and totalitarian societies. As this Court stated long ago:
It is a great mistake to suppose that because an atrocious crime has been committed, for which one ought certainly to be convicted anywhere, therefore a change of venue should not be granted. It is one of the crowning glories of our law that, no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere, he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in the case of the guiltiest as of the most innocent defendant answering at the bar of his country. And it ought to be a reflection, always potent in the public mind, that, where the crime is atrocious, condemnation is sure, when all these safeguards are accorded the defendant, and therefore the more atrocious the crime, the less need is there for any infringement of these safeguards.
Tennison v. State, 79 Miss. 708, 713, 31 So. 421, 422 (1902). In other words, a trial is conducted not only to determine that an atrocious crime has occurred, but to determine whether the accused committed the crime. Too often the former obscures the latter.
It should also be noted that, by perenially holding that a change of venue is granted solely at the discretion of the court, we perpetuate a burden on the trial judge. On the one hand, the judge is to act impartially, dispassionately and with scrupulous objectivity. On the other hand, in reality, the judge serves at the will of the citizenry of the district; the trial judge is, after all, a public official who must occasionally, perhaps even subconsciously, respond to public sentiment when making the decision to refuse a change in venue. It must be observed that, in granting a change, the trial judge might be perceived as implying that a fair trial cannot be had among his or her constituents and neighbors. As an aid to the trial court, some guidelines for a change of venue must be developed; some objective standards should be available to shield the court from even the appearance of such subtle coercion.
The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and the state constitutions. Adams v. State, 220 Miss. 812, 72 So.2d 211 (1954). "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, ..." U.S. Constitution Amendment VI. "In all criminal prosecutions the accused shall have a right to ... a speedy and public trial by an impartial jury of the *1210 county where the offense was committed... ." Miss.Const. Art. 3, § 26.
It is apparent that two potentially competing and conflicting rights are embodied in the provisions of both constitutions: the right to trial by an impartial jury and the right to trial in the locale where the offense was committed. It merits repetition that both of these rights are afforded the accused. Constitutional provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). As this court said in Eddins v. State, 110 Miss. 780, 783, 70 So. 898, 899 (1916):
The right to trial by an impartial jury is guaranteed by the organic law of the state, and when it is doubtful that such a jury can be obtained in the county of the venue of the homicide, the person on trial for his life is but asking for his rights when he requests a change of venue, there is no imaginable reason to refuse, except, possibly, a slight additional cost to the county. (emphasis added).
In Seals v. State, 208 Miss. 236, 44 So.2d 61 (1950), this Court was more explicit:
[U]nder the Constitution of the United States and of this State, Const. U.S. Amend. 6; Const. Miss. 1890, Section 26, accused persons are entitled to a fair and impartial trial. That means fair, unprejudiced, unbiased individual jurors, who are willing to be guided by the testimony given by the witnesses and the law as announced by the Court. But, a fair trial means more than that. It means, in addition to the right to be tried by such individual jurors, the right to be tried in an atmosphere in which public opinion is not saturated with bias and hatred and prejudice against the defendant; where jurors do not have to overcome that atmosphere, nor the later silent condemnation of their fellow citizens if they acquit the accused. The ascertainment of impartial justice is, or should be, the supreme object of all courts. It is for this purpose they exist and for which they are maintained. It is the object of the courts, as it has been the dream of the sculptors, to symbolize justice as an innocent maiden balancing in her hands the scales of justice, suspended and poised in the open light of day before the world, blinded to bias and prejudice, but ever awake to do fair and impartial justice.
See, in accord, Keeton v. State, 132 Miss. 732, 96 So. 179 (1923); Magness v. State, 103 Miss. 30, 60 So. 8 (1912); Tennison v. State, 79 Miss. 708, 31 So. 421 (1902).
Considered together, these cases would evince a standard for change of venue accordant with both constitutions. Eddins would require a change based on the showing that the impaneling of an impartial jury is merely doubtful. Seals would indicate that such doubt is automatically implicit when public opinion is saturated with bias, hatred and prejudice against the defendant.
The accused's right to a change of venue is clearly not self-executing; the defendant must file a motion supported by the affidavits of two witnesses with knowledge. Gilliard v. State, 428 So.2d 576, 579 (Miss. 1983); Gentry v. State, 416 So.2d 650, 651 (Miss. 1982); Purvis v. State, 71 Miss. 706, 14 So. 268 (1893). The precise procedure was announced by this Court in Wexler v. State, 167 Miss. 464, 473, 142 So. 501, 503 (1932):
An application for a change of venue must be supported by the affidavits of the number of credible persons required by the statute. The movant must `set out that, by reason of prejudgment of his case and grudge or ill will toward him in the public mind, he could not have a fair and impartial trial in (the) county where the offense was committed. This presents a prima facie showing for a change of venue ... (which the state must rebut).' See also Magness v. State 103 Miss. 30, 60 So. 8 (1912); McGee v. State, 200 Miss. 350, 26 So.2d 680 (1946)
By way of clarification then, the accused has a right to a change of venue when it is doubtful that an impartial jury *1211 can be obtained; such doubt is implicit when there is present strong public sentiment against the defendant; upon proper application, there arises a presumption that such sentiment exists; and, the state then bears the burden of rebutting that presumption.
It is evident that this presumption may be rebutted during voir dire, as is indicated in the Fifth Circuit case of United States v. Harrelson, 754 F.2d 1153 (5th Cir.1985):
An appellant can demonstrate that prejudicial inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. Proof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case. This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case. If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity. (internal citations omitted).
Id. at 1159.
However, the United States Supreme Court has indicated that, in some circumstances, pretrial publicity can be so damaging, the presumption so great, that no voir dire can rebut it. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).[1]
In the case sub judice, Leon Johnson submitted the requisite affidavit and, at the hearing on his motion, produced the evidence to prove the prejudgment of his case by the community. He called fifteen witnesses.
At a hearing on a motion for a permanent injunction, later incorporated by agreement into the motion for a change of venue, eight representatives of the local news media testified to the coverage given this case. Thomas Brennan, metro editor of the Meridian Star newspaper, stated that, to that date, sixty four articles had been published, fifty-four being front page stories. He further indicated that the case was important to the public because of the race of the defendant (black) and the race (white) of the victims, Eileen Grogan and Carl Malony, and because Mrs. Grogan was the mother of a police officer. The fact that extradition procedures required more than one year added to feelings of frustration, concern and other public sentiment.
Phil Moss, news director of WJDQ radio station, testified that his station had broadcast thirty-five stories regarding this case since the date of the crime. His station made seven newscasts daily.
Hugh Billups, news director at WMOX radio, indicated that his station broadcast thirty-four stories, two or three times per day, or as many as one hundred five total broadcasts.
Robert Barnes, news director at WOKKWALT radio, testified to having broadcast numerous stories, as many as six times per day.
Cherlyn Cannon, news director at WQIC ratio, stated that on a given day a transcript (news story) would be broadcast at least three times.
Don Cross, news assignment editor at WTOK television, indicated that they had telecast eleven stories on this case, each being broadcast on both the 6:00 p.m. and the 10:00 p.m. news programs.
Keith Ballard, news director at WHTV, said his station had broadcast twenty-five stories, each three times per day, at noon, 6:00 p.m. and 10:00 p.m.
Mike Golden, of WLBM television, stated that his station had reported thirteen stories on this case. He noted that WLBT TV, an associate station in Jackson, had broadcast about one-fourth of those stories.
*1212 All of the above witnesses who were employed in the electronic media testified that their broadcast coverage included, at least, all of Lauderdale County. The newspaper editor stated that his paper reached approximately 28,000 households in Lauderdale County. All were in agreement that they would continue to report on the proceedings in this case.
At the subsequent hearing on the motion for a change of venue, all of the aforementioned representatives from local radio and television stations testified to their continuing coverage of this case, which had been broadcast since the earlier hearing. Sydney Cearnel, assistant city editor for the Meridian Star, testified that the newspaper had also published nine additional stories. At the hearing, Hugh Billups, news director at WMOX radio, also testified that, based on his discussions about this case with other people, he found a great deal of sentiment against the defendant and that he did not believe Johnson could receive a fair and impartial trial in Lauderdale County. He felt the sentiments were due to the media coverage, the extradition problems, the nature of the crime, and the character of the victims.
Phil Moss, news director at WJOQ radio, gave additional testimony, stating that, based on his conversations with the public, he did not feel Leon Johnson could receive a fair trial in Lauderdale County. He felt a great deal of information had "gone out," had been repeated frequently and had influenced the public.
Obie Clark, director of the Lauderdale County Community Service Agency, testified that, based on his many conversations with community members, people associated this case with a series of violent crimes that had been committed in the community. He stated that the amount of publicity given the case would cause most of Lauderdale County's residents to have predetermined Johnson's guilt.
James Williams, teacher and coach in the Meridian Public Schools, testified that he had seen or heard many of the news accounts about this case and had discussed the case with the members of the community. He did not think a fair trial could be had due to the amount of community discussion and the nature of the crime.
Lucille Cox felt that the news media had expressed a prejudgment of the guilt of the defendant and that he could not receive a fair trial in Lauderdale County.
Jessie Palmer, a teacher and coach with the Lauderdale County Schools, testified to having discussed this case with more than one hundred people, the majority of whom felt Johnson was guilty. Palmer also stated that community discussion would resume each time an additional story was published in the newspaper.
Jeanelle Kidd stated that Leon Johnson could not receive a fair trial in Lauderdale County due to the publicity, the high community emotion and the character of the victims.
Callie Cole also did not think a fair trial could be had in Lauderdale County based on the publicity given the case and her conversations with people in the community. She said she had heard no one say that Leon Johnson was innocent; everyone she had talked with thought he was guilty.
The state then offered the following witnesses to rebut those of the defense. All testified that Johnson could receive a fair trial.
Bill Gordon, a Meridian barber, stated that he had not talked to many people about the case, and that it was not discussed too much in his barber shop. He stated that he had friends who were members of the local police department, many of whom were his customers. He went on to say that he had known Officer Carl Malony for six or seven years. He had known Officer Grogan (the son of the victim, Eileen Grogan) for about eight to ten years, and Officer Grogan was, in fact, a customer of his barber shop.
Everett Keller, a Sheriff of Lauderdale County for the previous twelve years, testified that he had heard no expression of prejudgment as to the defendant's guilt or innocence. Additionally, he said that, prior *1213 to being Sheriff, he had worked with Officer Grogan at the Meridian Police Department. Keller also said that his department had been actively engaged in the investigation of this case and that he had a personal interest in seeing this case to its outcome.
Bill Rogers, an employee of the City of Meridian, testified that he had not talked to anyone in the community about this case but, based on his belief that basically everybody in Lauderdale County was honest, he felt that there was no question that anyone would receive a fair trial there. He also said that he knew his fellow city employees, Officers Grogan and Malony.
Applying the law as enunciated in Eddins, Seals and Wexler, we are of the opinion that the trial court should have granted the motion for a change of venue at this point. Johnson made a prima facie showing of community prejudice by complying with the formalities, i.e., submitting an affidavit signed by two witnesses with knowledge. The presumption was then raised to an irrebuttable level, per Rideau, by the testimony of the fifteen defense witnesses who stated specific reasons why Johnson could not receive a fair trial in Lauderdale County.
One crucial question remains. What determines when the presumption becomes, in effect, irrebutable; that is, what circumstances, when present, would indicate that the defendant has a right to a change of venue as a matter of law? An examination of prior Mississippi cases will provide those guidelines.
In Stevenson v. State, 325 So.2d 113 (Miss. 1975), the appellant was convicted for the capital murder of a deputy sheriff. The state offered six witnesses who testified that the appellant could get a fair trial in the county where the crime occurred. The appellant presented an equal number who testified that, because of the widespread publicity by the news media and because the person killed was a popular law enforcement officer, the appellant could not get a fair trial. This Court reversed and directed that venue be changed to another county.
In Seals v. State, 208 Miss. 236, 44 So.2d 61 (1950), Frank Seals was convicted of murdering a game warden. After his arrest, he made statements which were publicized in two local newspapers, with headlines describing the statements as a confession. The deceased was a member of a large, influential and popular family in the community. After the news of this crime spread, a threatening crowd gathered outside the jail where Seals was being kept. He was subsequently convicted. On appeal this Court reversed.
In McGee v. State, 200 Miss. 350, 26 So.2d 680 (1946) a black man was charged with the rape of a white woman. The defendant's trial resulted in conviction and the death sentence. This Court reversed, stating "the State and the [trial] court paid no attention to the affidavit as to the ... change of venue other than the quoted denial ... which, without proof in support of the denial, had as well not been denied at all." Id. at 359-360, 26 So.2d at 683.
In Keeton v. State, 132 Miss. 732, 96 So. 179 (1923), the defendant was convicted of raping a woman "of such character as to inflame the mind and make it exceedingly difficult for the average person to try the case calmly and dispassionately." Id. at 736, 96 So. 179. A crowd assembled outside the jail where Keeton was held but was dispersed after assurances that the defendant would be tried in a few days. On appeal, this Court reversed the conviction for failure to grant a change of venue.
In Eddins v. State, 110 Miss. 780, 70 So. 898 (1916), the accused was convicted of murder and sentenced to life imprisonment. The victim was a kinsman of the sheriff responsible for summoning the veniremen. After the original venire had been quashed upon motion of the defendant, the sheriff resummoned fifty-five of the same men for a new venire. This Court concluded that the atmosphere in the county was not such as would insure a fair trial and reversed the conviction.
In Magness v. State, 103 Miss. 30, 60 So. 8 (1912) this Court reversed a conviction *1214 for murder based on public sentiment which had crystallized into a fixed belief of the defendant's guilt. This sentiment was made evident by threatened mob violence.
In Anderson v. State, 92 Miss. 656, 46 So. 65 (1908), the appellant, with eight other black men, was indicted for committing assault and battery on a white man. Anderson was convicted and sentenced to ten years imprisonment. Based solely on the testimony of witnesses at the hearing on the motion for a change of venue, this Court held that a change should have been granted.
In Brown v. State, 83 Miss. 645, 36 So. 73 (1904) the accused, inferentially a black man, was convicted of murder. The deceased was a member of a large family, presumably white, which lived in the town where the crime occurred. Despite the testimony of twenty-three people who stated that a fair trial could be had locally, this Court reversed, noting that evidence of threatened mob violence made it a mockery to talk of a fair trial.
In Owens v. State, 82 Miss. 31, 33 So. 722 (1903), the accused was convicted of killing one Williams, accidentally, while intending to kill Jones, a potential witness to Owen's (and others') illegal distillation of spirituous liquors. That killing caused little public agitation; however, the subsequent related killing of two police officers created great excitement. Upon application, a change of venue was properly granted Owens as to the cases against him for the murder of the police officers, but his application for a change of venue in the Williams case was denied. This Court reversed Owen's conviction for the murder of Williams, stating that the influence of the public's prejudgment against Owens for the murder of the policemen would be equally prevelant during his trial for the death of Williams.
In Tennison v. State, 79 Miss. 708, 31 So. 421 (1902), based upon testimony of witnesses at the pretrial hearing, to the effect that a fair trial could not be had, and notwithstanding the testimony of those who felt an honest jury could be impanelled, this Court reversed a conviction of manslaughter.
In Saffold v. State, 76 Miss. 258, 24 So. 314 (1898), the accused, a stranger in the community, was convicted for the murder of a postmaster whose family connections were numerous, prominent and influential. Based on the testimony of some twenty witnesses indicating community prejudice and on threatened mob violence, this Court ruled that venue should have been changed.
The most obvious element, common in the preponderance of the above mentioned cases, is the capital nature of the offense for which the accused is being tried. A heightened standard of review is employed on appeal where the defendant's life is at stake. See Laney v. State, 421 So.2d 1216 (Miss. 1982); Irving v. State, 361 So.2d 1360 (Miss. 1978). It follows then that the trial court should, likewise, be particularly sensitive to the need for a change of venue in capital cases.
It is also evident that, in several of the reversed cases, community prejudice was manifested by crowds threatening violence to the accused. Presumably, the days of lynch mobs are past. I would submit, however, that the emotions which compelled our forebears to such violence endure. There is no need to speculate here as to what now restrains such compulsions. It is sufficient to note that the presence of such threatened violence is a clear indication of community bias; its absence means little.
For obvious reasons, the matter of extensive media exposure has only been mentioned in the most recent cases, Stevenson and Seals. It is, however, a most important element to be considered relative to a change of venue.
To say that the media are all-pervasive in this day and age would only be to acknowledge the obvious. Newspapers and news broadcasts shape every community's understanding of itself. Public opinions and attitudes are reflected and affected concurrently. A prosecutor can reveal information and innuendo that could never *1215 be admitted in a court of law. Separate crimes which should be tried individually can become inextricably intertwined in print and over the airways. Public outrage can be raised to such a state that a defendant  any defendant  could not receive a fair trial. This is merely a reality of modern life. Recognizing this fact, when faced with a case which has been heavily reported in the news media, our trial courts must be prepared to readily grant a change of venue.
Additional factors would also be suggested by our prior cases, though as a practical matter, where these circumstances are present and egregious, the likelihood of extensive media coverage is great. Such circumstances would include serious crimes against members of prominent, influential families; serious crimes against public officials; and multiple crimes, such as mass or serial murders. It is also a sobering reminder of our social heritage to note that the testimony in the case sub judice would indicate that crimes committed by a black person upon a white victim may generate more community outrage than the same crime involving two members of the same race.
When these and similar circumstances exist, particularly in combination, it is incumbent that trial be had in as dispassionate an environment as possible. Judicial efficiency and economy would be better served by a change of venue prior to trial, than by trial, reversal and retrial. Justice would be better served by a fair trial initially.
The fair way is the safe way, and the safe way is the best way in every criminal prosecution. The history of criminal jurisprudence and practice demonstrates, generally, that if everyone prosecuted for crime were fairly and fully conceded all to which he is entitled, and if all doubtful advantages to the state were declined, ... there would be secured as many convictions of the guilty, and such convictions would be succeeded by few or no reversals.
Hill v. State, 72 Miss. 527, 534, 17 So. 375, 377 (1895).
While we are of the opinion that the foregoing discussion sets forth the better rule, we are not unmindful of the line of cases which holds that the "granting of a change of venue is ... so largely in (the) discretion of the trial court that a judgment of conviction will not be reversed on appeal ... unless it clearly appears that (the) trial court abused its discretion." (citations omitted) Billiot v. State, 454 So.2d 445, 454 (Miss. 1985).[2] After examining the record of the completed trial, per Billiot, supra at 455; Stevenson v. State, 325 So.2d 113, 118 (Miss. 1975); Franklin v. State, 189 Miss. 142, 158-159, 196 So. 787 (1940), we are strengthened in our view that Leon Johnson did not receive a fair trial.
In addition to the prejudicial circumstances enumerated during earlier discussion, Leon Johnson was represented by very inexperienced counsel, one of whom had only handled one prior criminal case. The other had no criminal or civil trial experience and had only graduated from law school a few months before. At the hearing on a motion to appoint co-counsel, five experienced criminal trial lawyers attested to the complexities involved in competently trying a case of this magnitude. The trial judge ruled that the two young attorneys had done such an admirable job during the hearing that they were competent to handle Johnson's defense without *1216 assistance. The fact that the inexperienced lawyers did a fine job is not as important as the pretzel logic employed by the judge. The situation is reminiscent of Joseph Heller's black comedy, Catch-22. Presumably, had they argued the motion poorly they would have failed. On the other hand, because they argued it well, they failed.
Also prior to trial, a hearing was held on a motion to suppress identification testimony. At that hearing it was revealed that Leon Johnson had been subjected to two lineups. After the second lineup was completed, it was learned that two of the identifying witnesses knew four of the men in the lineup with Johnson.
During trial, substantial evidence was elicited which strongly indicated Johnson's innocence. Perhaps the most compelling was the testimony of the state's witness Dr. Arthur Martin, who performed the autopsy on Mrs. Grogan. Dr. Martin testified that blood types can be determined from an examination of semen and that the semen removed from Mrs. Grogan's body was typed as B. Leon Johnson's blood was shown to be type AB. Therefore, the semen in the victim's body could not have been that of Leon Johnson.
Two of the witnesses who identified Johnson as being the offender in this case had extensive records of having violated the liquor laws. Both admitted being aware of a $10,000 reward that was offered in this case, and one stated that he intended to request the reward after trial. Neither came forward to make a statement until after the reward was posted.
A witness who observed the perpetrator's car fleeing the crime scene stated that the vehicle she had seen had more lights across the back than Johnson's car had. She also stated that the car at the scene had opera windows and a trunk-mounted CB antenna. Johnson's car had neither.
One of the state's witnesses who testified that he had been sleeping in a car with Johnson for approximately four hours shortly before the time the crime was committed, stated specifically that Johnson had been extremely close-shaven that morning. Another state's witness testified that the man he had observed in the store immediately prior to the time the crime occurred, the man he identified as Leon Johnson, had a two or three day growth of beard.
A defense witness testified that the car Leon Johnson was alleged to have used during the commission of the crime was, in fact, parked in front of a laundry in Butler, Alabama at the same time the crime occurred.
One eyewitness stated that Leon Johnson was not the man he had observed in the store the morning of the crime. This witness had the opportunity to observe the perpetrator for an extended period of time and testified that the man he saw had a mole over his left eye and was wearing a gold earring.
The witness who called the police on the morning of the crime testified that as he entered the store on that day, the perpetrator came out of a back room, talked with him, went back into the back room, and returned, putting on a Super Stop jacket. The man did not know the prices of items and could not open the cash register. This witness also observed that the man's left little finger tapered, as if it had been "stuck in a pencil sharpener." The witness's attention was directed to Leon Johnson's hands and he noted no such disfigurement. The witness further testified that it was from his description that the composite used to identify Leon Johnson was drawn. Nonetheless, he specifically stated that defendant was not the man he saw in the store on the morning of the crime.
If each of the above mentioned circumstances is considered alone and without reference to the others, affirmation of the trial court's decision might appear more compelling. But,
If we take the record as a completed history of the trial, and consider every incident thereof in its relations to the whole, we find ourselves impressed with the belief that appellant did not, and could not, have obtained a fair consideration *1217 of his case by an impartial jury to be drawn from the district of the county in which he was tried. Eddins, 110 Miss. at 781, 70 So. at 899,
In other words, taken cumulatively and conjunctively, all of the attendant facts and circumstances, as revealed at trial, demand reversal and a change of venue prior to retrial.
REVERSED AND REMANDED.
AS TO PART I: ALL JUSTICES CONCUR.
AS TO PART II: PATTERSON, C.J., and DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
ROY NOBLE LEE, P.J. and HAWKINS and ANDERSON, JJ., dissent.
WALKER, P.J., not participating.
ROY NOBLE LEE, Presiding Justice, dissenting as to Part II:
After a careful study of the entire record in this case and, in particular, the matters relating to the motion for change of venue, I am convinced that the trial judge did not abuse his discretion in denying the motion and that the judgment of the lower court should be affirmed. Therefore, I dissent from the majority opinion.
The homicide and robbery at the Super Stop convenience store occurred December 4, 1982, and the trial began almost twenty-one (21) months later on August 24, 1984. During that period of time, in the Meridian area, approximately seventy-three (73) newspaper articles were published and numerous newscasts were conducted over the local radio and television stations. A great deal of that publicity was given to the case during the investigation and in the early stages,[1] but the coverage was maintained to a lesser extent until and through the trial. The majority holds that, on account of the publicity, a fair and impartial jury was not selected for the trial; that appellant was not afforded a trial by an unbiased jury; and that his motion for a change of venue should have been sustained.
Counsel for appellant called fifteen (15) individuals to the stand in support of the change of venue motion, among them being Obie Clark, director of the Lauderdale County Community Service Agency and president of the local chapter of the NAACP; James Williams, a local teacher and coach; Lucille Cox, a 19-year resident of Meridian; Jessie Palmer, a local teacher and coach; Janelle Kidd, a 20-year Meridian resident, and Callie Cole, coordinator of the Neighborhood Service Center of the Multi-County Community Action Committee.[2] They testified that due to the extensive publicity given to the case, they did not believe appellant would receive a fair trial. I do not find that the record indicates they referred to and named people who had formed an opinion as to the guilt or innocence of the appellant.
Bill Gordon, a local barber; Everett Keller, an ex-sheriff of Lauderdale County; and William Rogers, a city employee; testified in behalf of the State on the venue motion. They expressed the opinion that appellant could get a fair trial, Gordon and Keller basing their opinion on the fact they had not heard much discussion concerning the case, and Rogers was of the belief that anyone would receive a fair trial in Lauderdale County.
The trial judge reserved his ruling on the motion for change of venue until after voir dire of the jurors. Over two hundred (200) jurors, including both the regular and special venires, were before the court for the selection of the trial jury and seventy-three (73) potential jurors were seated and questioned. The trial judge afforded unlimited voir dire of the jury to the attorneys and the appellant exercised eleven (11) of his *1218 twelve (12) challenges with one unexercised challenge remaining. All potential jurors, being under oath, stated they had no fixed opinion in the case and that they could, and would, hear the case and return a verdict based upon the evidence presented at trial and the instructions of the court. At the conclusion of the voir dire and selection of the jury, the trial judge denied the motion for change of venue and stated his reasons into the record as follows:
BY THE COURT:
Well, you did make the motion for change of venue and we heard it and I reserved a ruling on that until we were able to voir dire the jurors. And, I reserved a ruling on it and I think when  unless it's clear and obvious to the Court that a change of venue ought to be granted, I think this is the proper procedure as we have followed in this trial. You had unlimited voir dire. There were no restrictions on the questions that you could ask, the number of questions that you could ask, the length of time you could spend during the voir dire and when you finished that we selected the jury and the defendant challenged and used up eleven of the twelve challenges and we selected a jury and had some left over. I feel that the change of venue request in this case ought to be denied and it, therefore, is denied. Anything else?
Mississippi law fixes venue in criminal cases in the county where the crime occurred. The State has no right to change the venue, but an accused may file a motion and change the venue when evidence on the hearing clearly shows that he cannot obtain an unbiased and fair jury to hear and decide the case to be presented against him. However, the matter of granting a change of venue is within the sound discretion of the trial judge, and the refusal of a trial judge to grant a change of venue will not be reversed unless it is shown that there has been a clear abuse of discretion. This elementary principle has been established law since the early stages of our criminal jurisprudence. Billiot v. State, 454 So.2d 445 (Miss. 1984); Tubbs v. State, 402 So.2d 830 (Miss. 1981); Harrigill v. State, 381 So.2d 619 (Miss. 1980); Myers v. State, 268 So.2d 353 (Miss. 1972); Parks v. State, 267 So.2d 302 (Miss. 1972); Gallego v. State, 222 Miss. 719, 77 So.2d 321 (1955); Dalton v. State, 141 Miss. 841, 105 So. 784 (1925). Likewise, it is recognized that the facts in each case on a motion to change venue are different and that the question has to be decided on a case-by-case basis.
The majority opinion cites and discusses eleven (11) cases in support of its position, starting with the latest, Stevenson v. State, 325 So.2d 113 (Miss. 1975), a case decided prior to Jackson v. State, 337 So.2d 1242 (Miss. 1976), and extending back through Saffold v. State, 76 Miss. 258, 24 So. 314 (1898). Three (3) of the cases involved murder of officers; one (1) involved a black male charged with rape of a white married female, the mother of three children; five (5) involved homicide or rape cases (one assault and battery with intent to kill) where feelings were so aroused that mobs convened and threats of lynching were common. A concise statement of the facts of those cases is set forth in Appendix I attached hereto. A brief scan of the first five cases covering the period 1916 to 1975 shows the following:
In Stevenson v. State, two reversible errors were committed, (1) on proper showing, the lower court declined to have appointed a psychiatrist to make an examination of the accused or send him to Mississippi State Hospital for such an examination; and (2) two veniremen were not excused for cause. The Court held that the motion for change of venue was properly overruled by the lower court, but on a careful study of the record, the trial court should have sustained the motion for a new trial and changed the venue to another county.
In Seals v. State, sixty-five percent (65%) of the venire had fixed opinions that could not be changed by evidence. One juror was chosen and seated on the jury after the defendant had exercised all his peremptory challenges. That juror stated that he *1219 had an opinion but "thought" it would yield to the evidence.
In McGee v. State, the defendant was charged with the rape of a married white female, the mother of three small children. The defendant was spirited away from Jones County by the State Militia and kept in the Hinds County jail for safekeeping against mob violence. He was returned to Jones County for arraignment, and, except when the trial was going on under heavy guard, he was incarcerated in the Hinds County jail. His attorneys made a proper motion for change of venue supported by affidavits. The State offered nothing in opposition and the prosecuting attorney only dictated to the court reporter a denial of the motion.
In Keeton v. State, even the sheriff testified that "I think we can get a fair jury, but it will take a lot of trying." An excited capacity crowd packed the courthouse at trial and the influence exercised on the jury was obvious.
Since Jackson v. State, supra, October 5, 1976, there have been seventy-one (71) cases before this Court, where the death penalty was imposed. Even though all of them engendered a great deal of publicity, none have been reversed on the ground that the trial judge abused his discretion in declining to change venue.
In Gray v. State, 351 So.2d 1342 (Miss. 1977), (first trial) and Gray v. State, 375 So.2d 994 (Miss. 1979), (second trial), Jimmy Lee Gray was tried twice for felony murder and was sentenced to death. He is the only person upon whom the death penalty has been imposed who thus far has been executed. Both trials were had in Jackson County, Mississippi, where wide publicity was given to the case.
The writer has examined recent cases involving the question of change of venue and thirty (30) of those cases, which result in an affirmance by the Mississippi Supreme Court of a denial of motion to change venue, indicate the trial judge did not abuse his discretion. [See Appendix II].
In Myers v. State, supra, quoting from Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961), the Court said: "[T]his Court held that it would not reverse the trial court's denial of a motion for change of venue where a fair proportion of the prospective jurors examined on voir dire stated that they could give the defendant a fair trial." [268 So.2d at 359].
The Fifth Circuit Court of Appeals in United States v. Harrelson, 754 F.2d 1153 (5th Cir.1985), addressed the matter of obtaining an impartial jury and in rebutting a presumption of prejudice, said the following:
An appellant can demonstrate that prejudicial inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. Proof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case. This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case. If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity. [Citations omitted].
754 F.2d at 1159.
In the case sub judice, the trial judge did exactly what the Fifth Circuit Court of Appeals referred to in Harrelson, and he demonstrated from the voir dire of the venire that an impartial and fair jury could be, and was, selected.
The trial judge in the case sub judice examined the many exhibits in connection with the news articles; heard and observed the witnesses at the venue hearing; afforded unlimited interrogation and voir dire of the potential jurors; heard their responses to questions and observed their demeanor; and found that the jurors selected were unprejudiced, unbiased and constituted a fair jury for the trial of the case. I am of the opinion that he did not abuse his discretion *1220 in denying the motion to change venue and that he did not commit reversible error in doing so.
Therefore, I dissent from the majority opinion designated as Part II, and would affirm the judgment of the lower court and imposition of the death penalty.
HAWKINS and ANDERSON, JJ., join this dissent.

APPENDIX I

(1) Stevenson v. State, 325 So.2d 113 (Miss. 1975).

Appellant was convicted of the capital murder of a deputy sheriff. He was a trustee at the Warren County jail at the time of the killing; was indicted on July 10, 1974, and tried on July 22 of that same year. This trial resulted in a mistrial because the jury failed to agree on a verdict. He was retried on July 31, 1974, and convicted.
Appellant had filed a motion for change of venue, which was denied. The State offered six (6) witnesses who testified that, in their opinion, the appellant could get a fair trial in Warren County. Appellant presented an equal number of witnesses who testified because of the widespread publicity by the news media and because the person killed was a popular law enforcement officer, the appellant could not get a fair trial in Warren County.

(2) Seals v. State, 208 Miss. 236, 44 So.2d 61 (1950).

Seals was convicted of murdering a game warden. Motion to change venue was denied. He introduced fourteen (14) witnesses in support of his motion, including the county sheriff, who testified that the victim had numerous relatives and friends in the county. The sheriff removed Seals from the jail, after crowds had gathered around it. Statements given by Seals were published by two newspapers as "confessions," and the public regarded them as such. Sixty-five percent (65%) of the jurors examined during voir dire stated they had fixed opinions, or were so biased and prejudiced against Seals that they could not give him a fair trial. This Court reversed, holding that it was impossible for an accused to obtain a fair trial under such conditions.

(3) McGee v. State, 200 Miss. 350, 26 So.2d 680 (1946).

Appellant, a black male, was convicted of raping a white woman, married and the mother of three children. After being arrested, defendant was removed from Laurel to Jackson. A joint affidavit was filed by McGee's two attorneys in support of his motion for change of venue. In that motion, the attorneys alleged that the defendant was mentally unbalanced, incoherent, and unable to give a statement. In response, the State stated into the record that it denied McGee was insane, and also denied he did not get a fair and impartial trial. The Supreme Court reversed, stating that "[n]o attention, other than the dictated denial, was paid by the prosecution or by the court to the petition or motion contained in the affidavit as regard to the change of venue." 200 Miss. at 358, 26 So.2d 680. Such a denial of the change of venue, without proof in support of it, had as well not been a denial at all. 200 Miss. at 358-359, 26 So.2d 680.

(4) Keeton v. State, 132 Miss. 732, 96 So. 179 (1923).

The defendant was convicted of rape, for which he was indicted jointly with two others, and was tried separately. "The evidence of the appellants' alleged victim, if true [was] of such character as to inflame the mind and make it exceedingly difficult for the average person to try the case calmly and dispassionately." 96 So. at 179.
Upon arrest, a crowd assembled at the jail, with the intention of mobbing them, but were dissuaded from doing so by the county attorney and others by promises of a speedy disposition of the case. In conjunction with the change of venue motion, a number of witnesses were examined. The testimony made it clear that the charge against the defendants was known *1221 throughout the judicial district and had caused considerable excitement. The consensus of opinion was that appellant was guilty. Each trial was attended by an excited crowd which packed the courtroom to capacity.

(5) Eddins v. State, 110 Miss. 780, 70 So. 898 (1916).

Appellant was convicted of murder. Change of venue was denied. This Court reversed. The sheriff and circuit clerk who handled jury selection for the grand jury and trial jury were relatives of the victim. A majority of the names in the venire were persons residing in the supervisor's district in which the homicide occurred. The original venire was quashed, but the sheriff promptly resummoned fifty-five (55) of the same men to try the defendant. The trial judge said that his own investigations led him to believe that the public had not prejudged the defendant's case. This Court stated: "The learned judge seemed to be impressed with the idea that a change of venue would, in some way, reflect upon the well-known civic virtue of the citizenry of the good county of Jasper. It is obvious that the judge weighed his own opinion against that of the sworn witnesses."

(6) Magness v. State, 103 Miss. 30, 60 So. 8 (1912).

Defendant was convicted for murder committed in Grenada County. After indictment, he was removed to the Hinds County jail. "According to the evidence, this course was taken by [the sheriff] because of his apprehension of mob violence to the appellant." 103 Miss. at 41, 60 So. 8. The motion for change of venue conformed to statutory requirements, in effect creating prima facie showing for change of venue. The State did not contest the motion, but the trial court overruled the motion anyway. 103 Miss. at 43, 60 So. 8.

(7) Anderson v. State, 92 Miss. 656, 46 So. 65 (1908).

Appellant was indicted with eight (8) other black men for assault with intent to kill. Appellant and two others were jointly tried, convicted and sentenced to ten (10) years imprisonment. The gist of the testimony in support of his motion for change of venue was that virtually everyone knew about the case and that it was pre-judged. There was considerable ill will and prejudice against appellant. People expressed the sentiment that he ought to be lynched, and there were meetings of people where this was discussed. The newspapers claimed the entire thing was a race riot. 92 Miss. at 659, 46 So. 65.

(8) Brown v. State, 83 Miss. 645, 36 So. 73 (1904).

Appellant was convicted of murder. In this case, there were death threats against him at the hands of a mob, and threats of having appellant "if they had to blow up the jail with dynamite to get him." 83 Miss. at 646, 36 So. 73. There was testimony of a highly-inflammed state of public feeling at the time of the killing. The most universal expression was that he ought to be hung. Six (6) deputies guarded the defendant by day and sixteen (16) by night. In spite of this, the State had twenty-three (23) witnesses testify that they thought the defendant could get a fair trial. In light of this, this Court stated that "it is a mockery to talk of a fair trial." 83 Miss. at 647, 36 So. 73.

(9) Owens v. State, 82 Miss. 31, 33 So. 722 (1903).

The accused was convicted of killing Williams, while intending to kill Jones, who was a potential witness against him in an illegal liquor distribution scheme. That homicide caused little excitement. However, two law enforcement officers were killed shortly thereafter, causing considerable public agitation. The defendant was arrested and carried to Oxford, where a large crowd assembled. The change of venue was granted as to the police officers' death, but denied as to the killing of Williams. This Court reversed, stating: "It is conceded that pre-judgment existed in the [police officers'] cases ... Why, then did *1222 not the spirit of prejudgment in the public mind catch a new flame as soon as the public saw it had a foundation as potent in the Williams case as it had in the [police officers'] cases ...?"

(10) Tennison v. State, 79 Miss. 708, 31 So. 421 (1902).

Defendant was indicted for murder. Change of venue was denied. Tennison was then convicted of manslaughter and sentenced to serve twenty-five (25) years in prison. On the motion for change of venue, testimony showed that public sentiment ran high against the appellant, and that this feeling prevailed throughout the county. The feeling was so intense that lynching was threatened. Many people expressed a feeling that the defendant ought to be hanged. Some witnesses reluctantly admitted that a fair trial could not be had in that county. At the bail hearing, a large crowd was present, and when bail was denied, there was "vociferous applause, clapping of hands, rattling of sticks, and cheering." 79 Miss. at 710-11, 31 So. 421. The Supreme Court reversed, but also said on page 713, 31 So. 421 that "each case wherein a motion for change of venue is made must be determined on its own special facts. No general rule is possible of formulation."

(11) Saffold v. State, 76 Miss. 258, 24 So. 314 (1898).

Defendant was indicted for murder. Change of venue was denied. He was convicted of manslaughter. Twenty-five (25) witnesses testified that by reason of prejudgment in the case or ill will toward the defendant, he could not obtain a fair trial. The State offered twenty (20) witnesses, some of whom had formed opinions as to the guilt of the accused. The defendant was a stranger in the county. The victim was the local postmaster. His family connections were numerous, prominent and influential. One of the jurors was related to the victim, but did not know it. Another juror's wife was related to the deceased. There was threatened mob violence at the jail, caused by intense public feeling adverse to the appellant.

APPENDIX II
1. Winters v. State, 473 So.2d 452 (Miss. 1985).
2. Cabello v. State, 471 So.2d 332 (Miss. 1985).
3. West v. State, 463 So.2d 1048 (Miss. 1985).
4. Murphy v. State, 453 So.2d 1290 (Miss. 1984).
5. Billiot v. State, 454 So.2d 445 (Miss. 1984).
6. Wilcher v. State, 448 So.2d 927 (Miss. 1984).
7. Smith v. State, 445 So.2d 227 (Miss. 1984).
8. Gilliard v. State, 428 So.2d 576 (Miss. 1983).
9. Gentry v. State, 416 So.2d 650 (Miss. 1983).
10. Tubbs v. State, 402 So.2d 830 (Miss. 1981).
11. Harrigill v. State, 381 So.2d 619 (Miss. 1980).
12. Raymond Daumer and Linda Tuggle (Daumer) v. State, 381 So.2d 1014 (Miss. 1980).
13. Cunningham v. State, 357 So.2d 299 (Miss. 1978).
14. Loper v. State, 330 So.2d 265 (Miss. 1976).
15. Saucier v. State, 328 So.2d 355 (Miss. 1976).
16. Butler v. State, 320 So.2d 786 (Miss. 1975).
17. Worthy v. State, 308 So.2d 921 (Miss. 1975).
18. Pilcher v. State, 296 So.2d 682 (Miss. 1974).
19. Griffin v. State, 292 So.2d 159 (Miss. 1974).
20. Myers v. State, 268 So.2d 353 (Miss. 1972).
21. Parks v. State, 267 So.2d 302 (Miss. 1972).

*1223 22. Peterson v. State, 242 So.2d 420 (Miss. 1970).
23. Wilson v. State, 234 So.2d 303 (Miss. 1970).
24. Haralson v. State, 318 So.2d 891 (Miss. 1975).
25. Anderson v. State, 246 Miss. 821, 152 So.2d 702 (1963).
26. Slyter v. State, 246 Miss. 402, 149 So.2d 489 (1963).
27. Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961).
28. Gallego v. State, 222 Miss. 719, 77 So.2d 321 (1955).
29. Golden v. State, 220 Miss. 564, 71 So.2d 476 (1954).
30. Wheeler v. State, 219 Miss. 129, 63 So.2d 517 (1953), cert. den. 346 U.S. 852, 74 S.Ct. 67, 98 L.Ed. 367 (1953).
NOTES
[1] The record does not reflect how long the semen had been deposited in Ms. Grogan.
[2] This is not an entirely circumstantial evidence case.
[3] It is noted that two members of the Court were of the opinion that the lower court committed error in refusing to make available to appellant funds for a fingerprint expert.
[1] In Rideau, Justice Stewart refers to "the onrush of an electronic age" as contributing to the distructive exposure in that case. A generation later, in the midst of a so-called "information explosion," that observation, a fortiori, is particularly compelling.
[2] It should be noted that in Billiot the trial court granted one change of venue which moved the case from the county where the crime took place to a more populous, adjoining county where, it was felt, the accused was more likely to receive a fair trial. On appeal Billiot complained of the failure to grant a second change of venue. As this Court noted, "That the trial court might better have moved the trial further away from [the county where the crime occurred] is not the issue before us. The question is, Did the trial court's refusal to grant another change of venue ... deprive this defendant of the right to have his case fairly and impartially tried ... uninfluenced by the preponderant sentiment of the community?" (Emphasis added) Billiot, 454 So.2d at 455 (Miss. 1984).
[1] The homicide occurred December 4, 1982. Appellant was arrested in Alabama December 22, 1982, resisted extradition, and was returned to Mississippi on a Governor's extradition warrant January 6, 1983.
[2] The victim was white, appellant is black.